EXHIBIT "B"

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**
**FAMILY DIVISION**

| | | |
|---|---|---|
| NANCY JENNINGS, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. |
| vs. | ) | 2020CV337822 |
| | ) | |
| JEFFREY GALLUPS, | ) | |
| | ) | |
| Respondent. | ) | |

<u>**SPECIAL MASTER'S REPORT AND RECOMMENDATION RESPECTING STATUS**</u>
<u>**OF INCREMENTAL TRANSFER OF THE COMPANIES**</u>

Frank B. Strickland ("**Special Master**"), the duly appointed Special Master in this Civil

Action pursuant to the Court's February 8, 2023, *Order for Appointment of Special Master* (the

"**Appointment Order**"), reports to the Court[1] the following:

<u>**Introduction**</u>

1.       The Appointment Order authorizes and directs the Special Master to conduct the

sale of one or more of ENTI Surgery Center, LLC ("**ENTI**"), Milton Hall Surgical Associates,

LLC ("**Milton Hall Surgical Associates**"), and Alpharetta Surgery Center, LLC f/k/a Milton

Hall Surgical Center ("**Alpharetta Surgery Center**") (collectively, the "**Companies**") as soon

as possible at a realistic price which results in payment in full of all funds owed to Petitioner

Nancy Jennings, formerly Nancy Gallups ("**Petitioner**") by Respondent Jeffrey Gallups

("**Respondent**") under the January 2017 *Final Judgment and Decree of Divorce* (the "**Divorce**

**Decree**") entered in <u>Nancy H. Gallups v. Jeffrey M. Gallups</u>, and the Settlement Agreement

---

[1]This Report and Recommendation includes discussion of and materials relating to confidential
matters.  Accordingly, the Special Master is submitting this Report and Recommendation to the
Court *via* email, with service *via* email to the Parties' counsel of record and is not filing this
Report and Recommendation on the Court's docket at this time.  The Special Master
incorporates in this Report and Recommendation by reference his July 2, 2023, Special Master's
Report.

between Petitioner and Respondent dated as of October 28, 2016, (the "**Divorce Settlement**")
incorporated therein.

2.  On June 24, 2023, following four months of discussions with Respondent and
Respondent's counsel,[2] the Special Master sent an email to Respondent's counsel setting forth
the terms of an incremental transfer of the Companies to a "friendly doctor" who would own the
Companies pending the Special Master's marketing and sale of the Companies upon terms
acceptable to the Parties, the Special Master, and the Court. [Appendix 1].

3.  This incremental transfer of the Companies is necessary because Respondent has
been convicted of Medicare fraud. As a result, the Companies have lost or will lose their
Medicare eligibility unless the Companies are transferred out of Respondent's name and are no
longer under Respondent's control.

4.  On June 15, 2023, Respondent's counsel responded by letter, confirming that
Respondent agrees to the terms set out in the Special Master's June 24 email. [Appendix 2].

5.  Based on Respondent's agreement to the Special Master's terms, on June 21,
2023, the Special Master prepared and circulated a *Term Sheet Respecting Incremental
Transactions Respecting Nancy Jennings, Petitioner, vs. Jeffrey Gallups, Respondent, Superior
Court of Fulton County, Georgia, Family Division, Civil Action No. 2020cv337822* (the "**Term
Sheet**") for Petitioner, Respondent, and their respective attorneys' review and comment.

6.  On July 7, 2023, Respondent's counsel sent the Special Master a letter advising
that Respondent is reneging on his agreement to the Special Master's terms. [Appendix 3].

7.  For the Court's convenience, the Special Master is including in this Report and
Recommendation a summary of the terms proposed by the Special Master on June 24, 2023, as

---

[2]These discussions are set out in greater detail in the July 2, 2023, Special Master's Report.

further included in the Term Sheet, Respondent's agreement to those terms as confirmed by counsel's June 15, 2023, letter, and Respondent's about-face as communicated by counsel's July 7, 2023, letter. [Appendix 4].

8.      On July 20 and 21, 2023, and in response to the July 2, 2023, Special Master's Report, the Court conducted hearings, in-person and *via* Zoom, respectively.  These matters were addressed to the Court during those hearings.

## July 20 and 21, 2023, Hearings

9.      The July 20, 2023, hearing was attended by Petitioner and her counsel, Respondent and his counsel, the Special Master and his attorneys and Financial Advisor.

10.     Over the course of nearly 4 hours, Petitioner, Respondent, the Special Master and his professionals negotiated the Term Sheet and required changes to the Term Sheet.

11.     The Term Sheet, as so modified, was then read into the record in this case. Copies of the transcript of the July 20, 2023, hearing, the transcript of the July 21, 2023, hearing, and the Term Sheet, highlighted to illustrate the changes agreed to at the hearing and at the follow-up hearing on July 21, 2023, are included in this Report and Recommendation. [Appendix 5; Appendix 6; Appendix 7].

12.     The agreement reached by Petitioner, Respondent, and the Special Master following negotiations on July 20, 2023, as incorporated in the Term Sheet, as modified, and as read into the Court's record, requires *inter alia* (i) Dr. Gallups immediately to take all necessary steps to transfer all of his interest in the Companies to Dr. C_____ ("**Dr. C**");[3] and (ii) the management of the Companies' business to be vested in newco, Marble Management, LLC

---

[3] For confidentiality purposes, the transferee doctor is referred to in this Report and Recommendation as "Dr. C."

3

("**MM**"), which in turn would be managed in all respects by a four-member Board of Managers comprised of Melissa Moritz, Dan Smolczynski, Petitioner, and Greg Hays.

13.     Of all the agreed terms, the transfer of the Companies out of Respondent's name and control and into the hands of "friendly doctor" Dr. C is the most urgent. The Companies' Medicare eligibility, without which the Companies cannot survive, requires that Respondent have no ownership or control over the Companies. Respondent has repeatedly acknowledged this reality.

## Post-July 20/21, 2023, Activity

14.     Respondent has failed and refused to transfer ownership and control of the Companies to Dr. C.

15.     Further, Respondent has failed to cooperate and adequately communicate with the Special Master and Petitioner, as demonstrated by the following post-July 20/21, 2023, timeline:

   a.   July 24, 2023. Petitioner's counsel sends email to Respondent's counsel requesting copies of signed documents regarding the transfer of ownership in the Companies from Respondent to Dr. C, the transfer of Respondent's ownership in the management company to MM, and Respondent's corporate counsel's revisions to the MM operating agreement.

   b.   July 24, 2023. The Special Master's counsel sends email to Respondent's counsel requesting the same materials.

   c.   July 24, 2023. Respondent's counsel sends email which states:

   Dr. Gallups has signed the corporate transfer documents prepared by Bernie Grondin and we are waiting to receive the executed documents from [Dr. C] via his counsel.  Earlier this afternoon, Bernie Grondin sent the revised (pursuant to what was read into the record on Thursday before Judge Schwall) Marble Management LLC documents to Skip Sugarman, counsel for Ms. Moritz.  Skip has returned from a leave today, so we are

4

waiting to hear back from him as we presume that he will have points to address on behalf of Ms. Moritz with Bernie Grondin. Dr. Gallups informs me that the Medicare payments, if and when MHSA, LLC and the affiliated entities begin to receive them again follow the standard processes by pay claims one at time. There is no lump sum payment expected. MHSA, LLC suspects that here are thousands of claims to be paid and does not have an expected timeline. The most urgent debt of Dr. Gallups and MHSA, LLC is the $600,000 due the Department of Justice on or before September 5. We will update you on all matters as soon as we are able.

**NOTE: Respondent's counsel does not include the requested documents.**

d.  July 25, 2023. The Special Master's counsel sends email to Respondent's counsel requesting the previously discussed, signed clinic entity transfer documents.

e.  July 26, 2023. The Special Master's counsel sends email to Respondent's counsel again requesting the previously discussed, signed clinic entity transfer documents.

f.  July 26, 2023. Respondent's counsel sends email to the Special Master which states:

I just spoke to Dr. Gallups and got an update. This is a complicated and multi-party endeavor, but things are progressing favorably in my estimation. [Dr. C] has signed the ownership transfer documents prepared by Bernie Grondin that Dr. Gallups signed last Friday, 7/21/23, but apparently his lawyer, Douglas Grimm, wants the Marble Management LLC agreement signed by all parties before the "friendly doctor" documents are released. I just spoke to Skip Sugarman, who is representing Ms. Moritz. I understand that you just spoke to him too. Skip is negotiating with Bernie Grondin on behalf of Ms. Moritz and I understand that the Marble Management LLC operating agreement terms are close to being agreed to. Once everything is signed all of the documents will be circulated.

**NOTE: Respondent's counsel does not include the requested documents.**

g.  July 29, 2023. Respondent's corporate counsel sends draft documents, including a draft MM operating agreement. As demonstrated in Appendix 8 and Appendix 9,

the terms of these documents conflict in numerous material respects with the Term Sheet that the parties negotiated and read into the record at the July 20, 2023, hearing.

h.  August 1, 2023. The Special Master sends email to Respondent's counsel directing Respondent by close of business August 3, 2023, to provide the Special Master information about communications between Respondent's healthcare counsel and Medicare's Part B Contractor for Georgia, Palmetto GBA, LLC ("**Palmetto**"), stating as follows:

> Here is the message string in which on July 19 I asked for information about communications between Tony Maida and Palmetto.

> You said you forwarded my request to Dr. Gallups and Tony Maida.

> To date there has been no response to my request, which means that neither I nor Dr. Jennings and her counsel and the professionals advising me (Greg Hays, Dan Brown, John Rezac) are uninformed about the current relationship between Palmetto and the Milton Hall medical practices. Numerous announced deadlines have come and gone without further explanation.

> By copy of this message I am DIRECTING Dr. Gallups to cause this information to be sent to me (with copies to the individuals named above) on or before COB on Thursday, August 3, 2023.

i.  August 1, 2023. The Special Master sends email to Respondent's counsel directing Respondent to provide the Companies' weekly financial forecasts to the Special Master's Financial Adviser, as follows:

> Greg Hays informed me today that he hasn't received any weekly forecasts for the medical practices since June.  The forecast is in the form of an Excel spreadsheet routinely prepared by Adam Holshauser.

> Effective with this week's forecast, I'm directing that the weekly forecast be sent directly to Greg Hays.

j.  August 2, 2023. Respondent's counsel sends letter to the Special Master stating in

part as follows:

The time is NOW to get the corporate documents signed and the transfer of the MHSA, LLC practices out of Dr. Gallups' name complete. The practices are at a risk of total failure, Dr. Gallups has continually stated that employees of the practice are a threat to leave and now it is on the brink of happening. Attached please find a list of exigent concerns from employees and patients of Milton Hall Surgical Associates, LLC:

. . .

Please approve and sign off on the transfer documents and Operating Agreement of Marble Management, LLC as soon as possible. This is urgent.

k.  August 2, 2023. The Special Master sends email to Respondent's counsel, stating

as follows:

Dan Brown's partial list of comments on the documents sent by Bernie Grondin are set forth below.

As to a transfer to [Dr. C], please send us the [Dr. C] documents.  When I say "us" or "we," I refer to Elizabeth and Nancy  together with my advisors, Dan Brown, John Rezac and Greg Hays.

Several weeks ago, we suggested proceeding on an incremental basis with a transfer to a friendly doctor as the first order of business.

The response was that [Dr. C] won't sign the transfer documents unless everything else is in place. Assuming that we have no issues with the [Dr. C] documents, we would urge an immediate transfer of the practices followed by notice to Palmetto. We can then proceed with the other documents.

l.  August 3, 2023. Melissa Moritz's counsel contacts the Special Master's counsel

to discuss significant, material terms Ms. Moritz wants included in the MM

operating agreement.

m.  August 3, 2023. The Special Master's Financial Adviser has in-depth and

productive call with Dan Smolczynski, one of the anticipated members of the MM

Board of Managers.

7

n.  August 4, 2023. The Special Master's counsel sends email to Melissa Moritz's counsel advising that the Special Master will not be negotiating with a non-Party the terms of the Parties' agreed Term Sheet.

o.  August 4, 2023. The Special Master sends email to Respondent's counsel stating, "Please send me copies of the [Dr. C] documents (as requested several times) and an explanation as to why the [Dr. C] documents can't be signed immediately as part of an incremental approach."

p.  August 4, 2023. the Special Master sends email to Respondent's counsel stating, as follows:

Thanks for the information provided by Robin Beatty.

As to the [Dr. C] documents, Elizabeth reminded me that Jeff testified that the [Dr. C] documents were being signed on July 20.

And on 7/21, Nancy recalled that "Pete told the court that the documents were being signed "as he spoke" because someone had taken them to Dr. [Dr. C] who was in clinic seeing patients."

I have requested the [Dr. C] documents on several occasions, but they haven't been produced. I want copies of the [Dr. C] documents.

If, contrary to the statements made to the court by you and Dr. Gallups, they haven't been signed, I want to know why. Let's get the straight story today on the [Dr. C] documents.

q.  August 4, 2023. Respondent's counsel sends email responding to the Special Master's request for documentation, as follows:

I do not have copies of the transfer documents signed by [Dr. C]. According to Bernie Grondin, and counsel for [Dr. C], [Dr. C] considers the transfer of MHSA, LLC and the affiliated entities ownership to him by Dr. Gallups to be very fragile, and he has not authorized the release and dissemination of the ownership transfer documents until he and his counsel have seen that all of the transfer documents (those involving the establishment of Marble Management, LLC and the operating agreement relating to it) have been agreed by all parties and executed. ***Dr. Gallups***

8

> *believes that inquiries to [Dr. C]/his counsel from you will "spook" [Dr. C] and result in his rescinding his agreement to be the "friendly doctor" of the ownership transfer*.  (Emphasis added).

**NOTE: Respondent's counsel does not include the requested documents.**

r.  August 4, 2023. The Special Master learns from Petitioner (and never from Respondent) that August 4, 2023, is the last day for the Companies' CFO, Adam Holzhauer.  Respondent may or may not have hired a replacement CFO, but in any event Respondent has not been forthcoming with this crucial information relating to the management of the Companies.

16.  It has now been more than two weeks since the Court's July 20 and 21, 2023, hearings. Despite numerous requests during that time for documents confirming the transfer of the Companies' business to Dr. C, Respondent has failed to timely make those documents available, and the documents that have now been presented conflict with the agreed terms announced by the Parties on the record.

17.  Respondent again claims that any contact by the Special Master and "friendly doctor" Dr. C is going to jeopardize the transaction Respondent claims to have put in motion. This is reminiscent of Respondent's conduct when he purportedly negotiated a similar transaction with Dr. Angel. Consequently, the Special Master, Petitioner, and the Court are expected to simply take Respondent's word that "things are progressing favorably."

18.  As noted above, the draft MM operating agreement and related documents provided by Respondent's corporate counsel are in direct conflict with the agreed terms read into the record at the Court's July 20, 2023, hearing, or include terms that the Special Master and the Petitioner cannot agree to, including:

a.  improperly limiting the authority of the MM Board of Manager;

9

b.  improperly expanding the authority of Melissa Moritz in the management of MM and the Companies, including through the implementation of "Member Control Rights;"

c.  imposing an obligation on MM to guarantee the $50 million personal debt obligation of Melissa Moritz to Respondent;

d.  imposing upon the Companies obligations to pay Respondent's life insurance premiums, "key man" premiums where Respondent, directly or indirectly, is the beneficiary, and other "Certain Continuing Obligations;"

e.  establishing a $360,000 salary for Melissa Moritz, with a three-year severance ***should she be terminated for any reason***; and

f.  imposing upon MM the obligation of lending Respondent $650,000 at 5% APR.

19.     Further, and again despite repeated requests for meaningful information, Respondent refuses to provide the Special Master information of the specific status of the Companies' Medicare eligibility, revocation, revocation appeals, etc.

20.     The Special Master is concerned that Respondent is not acting in good faith, is actively concealing vital information from the Special Master, and is engaged in a pattern of misdirection and delay.

21.     Respondent has refused to respond to the Special Master's repeated requests for accurate information regarding Respondent's eligibility for Medicare participation. To date, Respondent has not confirmed the status of his eligibility.

22.     Respondent has asserted that, because Ms. Moritz is represented by separate counsel and Respondent and Ms. Moritz are now divorced, Respondent has no influence over

{02624777-4 }

Ms. Moritz and the terms agreed to by the Parties following nearly four hours of negotiations should not be binding on Ms. Moritz.

23.     The Special Master doubts the sincerity of Respondent's position and is increasingly concerned that Respondent is using Ms. Moritz's third-party status as a wedge in this transaction and an excuse to reject the terms to which he agreed and testified in open court and to maintain his own control over the Companies.

24.     Fueling these concerns is the fact that Respondent's corporate counsel has drafted transaction documents that are both (i) favorable to Ms. Moritz, and (ii) inconsistent with the terms agreed to by the parties and read into the record—*e.g.*, drafting guaranty provisions into the documents that require MM to shoulder the financial burden of Ms. Moritz personal payment obligations to Respondent under their promissory note, and provisions into the MM operating agreement that grant Ms. Moritz powers above and to the exclusion of the MM Board of Managers.

25.     As discussed in the July 2, 2023, Special Master's Report, Respondent continues to refuse to provide the Special Master full access to the Companies' books and records, including financial records.

26.     Respondent refuses to comply with the Court's Appointment Order provisions requiring Respondent to pay the Special Master's attorneys' fees

<u>**Special Master's Recommendation**</u>

27.     Respondent has given and continues to give every indication that he has no intention of complying with the Parties' agreement or this Court's Appointment Order setting forth the Special Master's duties and authority.

{02624777-4 }

28.     Respondent is attempting to hide behind a non-party, Melissa Moritz, claiming that he has no control over her as she is not a party to this civil action and is represented by counsel.

29.     It was Respondent, however, who suggested transferring ownership of the Companies' management company to Melissa Moritz who, until very recently, was Respondent's spouse and who, upon information and belief, is now divorced from Respondent only for strategic purposes relating to the management of the Companies given Respondent's conviction for Medicare fraud.

30.     Whether this Court has jurisdiction over Melissa Moritz, this Court certainly has jurisdiction over the Companies and, therefore, over any person or entity managing the business of the Companies.

31.     Despite the Special Master's repeated requests, Respondent refuses to provide copies of the signed documents necessary to transfer ownership of the Companies to Dr. C and establish MM as the manager over the Companies.

32.     Plainly stated, Respondent refuses to relinquish control over the Companies, notwithstanding the fact that it is his ownership and control that threatens the very survival of the Companies. This may be stubbornness or, worse, Respondent's employment of a scorched-earth strategy—if he cannot have the Companies, nobody can.

{02624777-4 }

33.     Respondent further refuses to pay the Special Master's fees and the fees of professionals engaged by the Special Master as required by the Appointment Order, which are as follows:

| | |
|---|---|
| Special Master | $80,939.84 |
| Daniel Brown, Taylor English Duma LLP (Regulatory/M&A Counsel) | $42,512.50 |
| Greg Hays, Hays Financial Consulting | $47,118.00 |
| TOTAL (as of August 7, 2023) | **$170,570.34** |

Respondent claims poverty as the reason for his failure to satisfy those Court-ordered obligations. Respondent has thus made his personal financials an issue in this civil action.

34.     Accordingly, the Special Master respectfully recommends that the Court enter an Order:

a.  directing Respondent immediately to provide the Special Master copies of the signed documents effecting the transfer to Dr. C of Respondent's interest in the Companies;

b.  directing Respondent immediately to execute or cause to be executed all documents necessary for the transfer of management of the Companies to MM consistent with and including all terms of the Term Sheet, as modified and read into the record on July 20, 2023;

c.  directing Responded immediately to provide the Special Master full access to all of the Companies books and records, including financial records and banking records;

d.  directing Responded immediately to provide the Special Master full access to all of Respondents' personal books and records, including financial records and banking records;

13

{02624777-4 }

  e. directing Respondent immediately to provide the Special Master all available information respecting the Companies' Medicare eligibility, revocation of Medicare eligibility, and any appeal of such revocation; and

  f. directing Respondent immediately to pay all fees of the Special Master and his engaged professionals in the amounts set forth above, and to replenish the retainer required under the Appointment Order.

35. During the July 20, 2023, several issues were stated on the record as "reserved." It is the Special Master's intention to offer recommendations to the Court for the resolution of those reserved issues. Given the lack of progress respecting those issues that were not reserved-*i.e.*, were agreed to by the parties-the Special Master is not able at this date to make recommendations respecting the reserved issues. Those issues are still pending resolution.

   **RESPECTFULLY SUBMITTED**, this 8th day of August, 2023.

        SPECIAL MASTER


        /s/Frank B. Strickland
        Frank B. Strickland
        Georgia Bar No. 687600

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA  30339
Tel. 678-336-7133
Fax. 770-434-7376
fstrickland@taylorenglish.com

{02624777-4 }

APPENDIX "1"

**From:** Frank Strickland <fstrickland@taylorenglish.com>
**Sent:** Wednesday, June 14, 2023 5:39 PM
**To:** Peter V. Hasbrouck <pvhasbrouck@martensonlaw.com>
**Cc:** Elizabeth Lindsey <ELindsey@DMQLaw.com>; Nancy Jennings <nhgallups@gmail.com>; Greg Hays <ghays@haysconsulting.net>; Daniel B. Brown <dbrown@taylorenglish.com>
**Subject:** Jennings v. Gallups

Pete,

This is in response to your message sent today at 2:14 pm.

Nancy agrees with an incremental approach. In concept, she would be willing to have Jeff assign 100% of his interest in the three entities, subject to a complete indemnification of her by the entities, Jeff, and Melissa.  She has no idea as to what she is walking into. Dr. Gallups has agreed in principle with this item.

As Special Master I will require that Marble LLC have three managing members: Melissa Moritz, Nancy Jennings, and Greg Hays. Nancy and Greg would have no liability under the promissory note. D&O insurance and audited financial statements will be required. Any employment agreement between Melissa and Marble would be subject to approval by the three managing members. The proposed seven-year provisions are unacceptable in that they would tie my hands in the performance of my duties as Special Master. **<u>This provision is a requirement of the Special Master and is not negotiable.</u>**

Jeff must pay $200,000 in non-taxable alimony to cover Nancy's past fees to date and any future fees incurred by her in concluding a deal and the enforcement of the deal and the Settlement Agreement.  Nancy is willing to give him time, but would want a schedule of payments so that payment in full would be no later than March 2024.

Jeff has agreed to reimburse Nancy on or before December 31, 2023 for her taxes and accountant fees for ASC income for which she was not provided K-1s or a tax distribution. To date, she has not received a 2021 or 2022 K-1 which she needs on or before 9/15/23.

Nancy must receive an upside, including participation in any rollover, if the practices are sold for more than $50 million. The proposed upside calculation may work, but Nancy hasn't had time to evaluate it.

Jeff needs to provide additional life insurance so that Nancy is the unfettered and sole beneficiary of $10,250,000 in life insurance.  The terms of the $5 million insurance policy provided in the Settlement Agreement shall not change.

Jeff must pay the Special Master and the professionals I have engaged; Greg Hays and Dan Brown. **This is a Special Master requirement and is not negotiable**

In my capacity as Special Master, among other duties, I'm charged with selling the practice for a reasonable price. As stated above, it is unacceptable to me for Melissa to be the sole managing member of Marble. I will require that there be two additional managing members of Marble: Nancy Jennings and Greg Hays. There would be indemnification of both by Jeff together with D&O coverage as stated above. At some point the amount of the promissory note ($50 million) may be viewed as excessive and could place a damper on a potential sale. There may be a need for an agreement to modify the promissory note to an amount the market will support. **These are Special Master requirements and are not negotiable.**



**Frank B. Strickland** |
**Taylor English Duma LLP** | 1600 Parkwood Circle, Suite 200, Atlanta, GA 30339
P: 678.336.7133 | fstrickland@taylorenglish.com
Website | vCard

Click here to learn more about our TED Tenets.

APPENDIX "2"

**MHS**
**MARTENSON**
**HASBROUCK**
**& SIMON LLP**

Peter V. Hasbrouck
**Attorney at Law**
(404) 909-8115
pvhasbrouck@martensonlaw.com

June 15, 2023

**VIA E-MAIL ONLY TO:** fstrickland@taylorenglish.com
Frank B. Strickland, Esq.
Special Master
Taylor English Duna LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339

<u>**For Settlement Purposes Only**</u>

Re:    *Nancy Jennings f/k/a Nancy H. Gallups v. Jeffrey M. Gallups*
        Superior Court of Fulton County
        <u>Civil Action File No.: 2020CV337822</u>

Dear Frank,

I have conferred again with Dr. Gallups and Melissa Moritz and this letter is written on Dr. Gallups' behalf in response to your email to me of 5:39 PM on June 14, 2023:

1.  On the issue of your request as Special Master that Marble, LLC have three managing members, Dr. Gallups and Melissa agree that Greg, Melissa and Dr. Jennings can be the three managing members.

2.  On the issue of Dr. Gallups paying $200,000 in non-taxable alimony to Dr. Jennings (to cover past and expected future legal fees), Dr. Gallups is willing to have this be a term of the agreement to allow him to transfer ownership interest in MHSA, LLC and its related entities, but he (the business) will need terms beyond March 2024 in which to pay it due to the current level of cash flow in the business.

3.  Dr. Gallups has agreed on the tax and accounting fees on ASC regarding Dr. Jennings as per the terms of your email.

4.  The "upside" participation for Dr. Jennings has been addressed in previous emails. Similarly, the additional life insurance issue has been addressed.  I believe that there is an agreement on both issues.

5.  Dr. Gallups understands that he must pay you as Special Master and Greg Hays and Dan Brown, but needs terms on those obligations as well as neither he or the business have the resources to pay now.

Frank Strickland, Esq.
June 15, 2023
Page 2

6. The terms on your role in the prospective sale of the practice are agreeable.  You, of course, would have an ongoing role in all aspects, including to address the necessity to modify the 50MM promissory note that is part of the contemplated transaction at some point, if necessary.

Please consider the above and respond accordingly.

Very truly yours,

**MARTENSON, HASBROUCK & SIMON LLP**

Peter V. Hasbrouck

PVH/jbg

cc:     Dr. Jeffrey Gallups (via e-mail only; w/encls.)

APPENDIX "3"



**MARTENSON**
**HASBROUCK**
**& SIMON LLP**

Peter V. Hasbrouck
Attorney at Law
(404) 909-8115
pvhasbrouck@martensonlaw.com

July 7, 2023

**VIA E-MAIL ONLY TO:** fstrickland@taylorenglish.com
Frank B. Strickland, Esq.
Special Master
Taylor English Duna LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339

      Re:    *Nancy Jennings f/k/a Nancy H. Gallups v. Jeffrey M. Gallups*
              Superior Court of Fulton County
              <u>Civil Action File No.: 2020CV337822</u>

Dear Frank,

        This letter to you, copying Elizabeth Lindsey, Esq. will address several matters.  The first is to inform you that on Wednesday, July 5, 2023, Dr. Gallups received the enclosed "exclusion letter" dated June 30, 2023, from the Office of Inspector General (OIG).  Pursuant to this letter, on July 20, 2023, Dr. Gallups and Milton Hall Surgical Associates, LLC and their related entities will no longer be able to participate in "all Federal Healthcare  programs" as more specifically defined in the enclosed letter.  Transfer of ownership in Milton Hall Surgical Associates, LLC and its related entities must be effectuated immediately.

        There are two distinct issues regarding MHSA, LLC's ability to maintain its federal and commercial insurance contracts. Currently the commercial insurers have not notified MHSA, LLC of termination. On the other hand, Medicare and their contracted insurers (CMOs) which include WellCare/Centene among others, have notified MHSA, LLC of its imminent termination. Regarding Medicare and Medicaid, there are multiple parties in play.  First, HHS-OIG has set the termination date under Dr. Gallups ownership on July 20, 2023.  This is a "hard date" according to Scott Grubman, Esq., Dr. Gallups criminal defense lawyer.

        As of that date, Dr. Gallups is not allowed to own, operate or participate in any manner in the healthcare arena.  Second, CMS which administers Medicaid and Medicare have been notified by Palmetto (as the arbiter for federal funded health programs in Georgia) of MHSA, LLC's termination under their policies (even while MHSA, LLC awaits the request to stay given the hopeful imminent transfer of the practice).  Palmetto has granted MHSA, LLC a window of time to complete the ownership transfer, but they have listed MHSA, LLC practices as terminated at present.  The CMOs have been made aware, and MHSA, LLC has received a termination notice from one of the CMOs.  WellCare/Centene has started withholding funds payable to MHSA, LLC as of July 6, 2023, and sent the termination notice.  This action could force MHSA, LLC to go

Frank Strickland, Esq.
July 7, 2023
Page 2

bankrupt within a few weeks.  MHSA, LLC must make the transfer of ownership immediately so that Palmetto can allow continued participation of the practices. MHSA, LLC will ask Palmetto to contact the CMOs to reverse any termination notice.  If and once any CMO terminates MHSA, LLC's practices, MHSA, LLC will have to reapply for new contracts which could take 3 to 6 months. Should this occur, MHSA, LLC cannot sustain the financial impact of this action. The companies must be transferred now.

Secondly, this letter will provide you with Dr. Gallups response to your proposed Term Sheet, and "the transactions intended and summarized therein." Dr. Gallups response is in the same numerical below as presented in your proposed Term Sheet:

1.      Dr. Gallups assignment to Dr. Jennings of interests in the Companies.

Gallups RESPONSE:        Bernie Grondin has provided the documents for the transfer which provides for the items you list in this paragraph in your proposed Term Sheet.  An exception is that Dr. Jennings cannot be compensated as medical director as doing so will put her ability to receive her disability payments in jeopardy.

2.      Marble Management, LLC.

Gallups RESPONSE:        Dr. Gallups and Melissa Moritz are separate and distinct parties. Ms. Moritz is not a party to the lawsuit styled *Nancy Jennings f/k/a Nancy H. Gallups v. Jeffrey M. Gallups,* Superior Court of Fulton County; Civil Action File No. 2020CV337822 for which you have been appointed as Special Master, nor is she a party to the underlying divorce case styled *Nancy H. Gallups v. Jeffrey M. Gallups,* Superior Court of Fulton County; Civil Action File No.: 2016CV274575.  Ms. Moritz has retained her own counsel, Skip Sugarman, Esq., and he will be contacting you on her behalf regarding your proposed term sheet and specifically respond on terms regarding her proposed involvement going forward.   Bernie Grondin, Esq. is preparing an Operating Agreement for Marble Management, LLC for your review.  Dr. Gallups' proposal, subject to review and input by Skip Sugarman on behalf of Ms. Moritz, would be that under the Operating Agreement of Marble Management, LLC, Ms. Moritz would be named the Sole Managing Member/Operator of the entity and would have complete authority over the Company's day-to-day operations, without any special member control or ability to direct business affairs (but with complete visibility as to all Company operations and finances provided by Ms. Moritz for Dr. Jennings) for five (5) years from the date of the Operating Agreement.

Dr. Gallups further proposes that if any equity transaction is not initiated and completed by the fifth year (from the date of the Operating Agreement), or if there is an offer to buy Milton Hall Surgical Associates, LLC and its related entities ("the Companies") of $50,000,000.00 or more at any time, under the Marble Management, LLC's Operating Agreement would then, and only then, provide for one special member, to be selected by Dr. Jennings, to call a special meeting and cause/compel Marble Management, LLC to sell the Companies for the $50,000,000.00 (or greater amount).  Alternatively, at Dr. Jennings' discretion at the five (5) year mark (from the date of the Marble Management, LLC Operating Agreement), presuming no sale has occurred, the Companies could be compelled to retain an investment banker/broker of Ms. Moritz's choosing

Frank Strickland, Esq.
July 7, 2023
Page 3

and actively market the Companies for sale. At any point, however, from the onset of the Marble Management, LLC Operating Agreement being in effect, Ms. Moritz (at her discretion as Managing Member) can proceed to close/effectuate any sale in any amount that will result in Dr. Jennings receiving her $10,250,000.00 payment at closing (as per the Gallups/Jennings Settlement Agreement).

As for your statement at Paragraph 2 (and its subparagraphs) that your stated terms on the formation and composition of Marble Management, LLC "is a requirement of the Special Master and non-negotiable," Dr. Gallups disagrees with and rejects same. He believes, and I agree with him, that your role as Special Master in the case does not provide you with the authority to take control of the Companies, and/or insert yourself as Special Master, Greg Hays as a designate or Dr. Jennings into an ownership or management position in same. Dr. Gallups agrees that Ms. Moritz should have an employment agreement on file and that the specifics of same should be in the Operating Agreement being prepared by Bernie Grondin, Esq.

Annual audited financials and monthly financials will be provided to Dr. Jennings as the "friendly doctor" of the medical practices. She can use the consultant of her choice to review them at her expense. Greg Hayes would be a good resource for her given his level of knowledge to this point.

     3.     Alimony.

Gallups RESPONSE:     These provisions are acceptable.

     4.     Special Master Fees.

Gallups RESPONSE:     Dr. Gallups has reconsidered and refuses to pay Dr. Jennings $200,000.00 in fees incurred with Ms. Lindsey since the onset of the ongoing underlying case before Judge Schwall. Ms. Lindsey has, for years now, tried to make payment of her fees a negotiating term on various issues and specifically on the issue of the ownership transfer of the Companies. Her requests for fees in numerous Motions filed over the last 24 months in the case before Judge Schwall, have either been outright denied by Judge Schwall (see Order dated May 20, 2021) or granted in part (despite requests for an amount much higher than awarded) and paid by Dr. Gallups (see Order dated November 3, 2021). These Orders were previously provided to you. Please take note that despite all of the constant and acute distress on the Companies and on Dr. Gallups personally, he remains compliant with a key component of the divorce Settlement Agreement, that is paying Dr. Jennings $65,000.00 per month in alimony. Despite the fact that Dr. Gallups is under tremendous personal and professional financial distress, he is NOT in Contempt. Payment of Dr. Jennings' attorney's fees is simply a tax being added onto a transaction that could have been completed in the last calendar quarter of 2022, before your appointment as Special Master in the case. Dr. Gallups, however, understands, acknowledges and accepts your appointment as Special Master, and your desire to be paid, and for your designates to be paid as well. As will be discussed below and as evident from the latest numbers from Adam Holzhauer, VP of Finances for Milton Hall Surgical Associates, LLC provided with this letter, Dr. Gallups and the Companies will need payment terms to pay you and Mr. Hays.

Frank Strickland, Esq.
July 7, 2023
Page 4

     5.     K-1s.

Dr. Gallups RESPONSE:     Dr. Gallups needs Dr. Jennings to advise him (and provide proof of same) of the CPA fees she has and will incur in amending her 2021 and 2022 tax returns. Dr. Gallups will provide Dr. Jennings with 2021 and 2022 K-1s by September 30, 2023 and reimburse her for $8,500.00 in taxes she has previously paid.

     6.     Sale of the Practice.

Dr. Gallups RESPONSE:     Paragraph 6 of the Settlement Agreement incorporated into the Final Decree of Divorce shall be amended to allow Dr. Gallups to transfer ownership of the entities, but he does not agree that language regarding the sale of the Companies should be included in the amendment. He also does not agree that the term "sale" should include provisions regarding the Companies obtaining a loan. The Companies need to obtain a loan or additional line of credit to first, be sustainable and viable (and so as to pay Dr. Jennings her alimony), and then to grow and improve the Companies EBITDA to further and enhance the prospects for a potential sale. Obtaining a loan cannot and should not trigger an obligation for Dr. Gallups to pay Dr. Jennings her $10,250,000.00. That should only come due upon a sale of the Companies. Language has been included in the transfer documents that Dr. Jennings will receive an incentive for a valuation and sale above $50,000,000.00 as set out in your examples of Paragraph 6 of your proposed Term Sheet.

     7.     Special Master to Remain until practice sold after ownership by Dr. Jennings.

Dr. Gallups RESPONSE:     Dr. Gallups requests that there be a "date of closure" on your involvement as Special Master and that the pending contempt case should ultimately be dismissed. The Companies cannot afford the ongoing involvement of a Special Master and numerous designates.

     8.     $50,000,000.00 Promissory Note.

Dr. Gallups RESPONSE:     Dr. Gallups agrees with this proposed term except disagrees with and disputes that the Special Master shall have the authority to adjust the principal amount of the note downward. As long as Dr. Jennings receives her monthly alimony, Dr. Gallups is compliant with the Court Order in place and is under no contractual obligation to sell the Companies on a date certain or for a price certain.

     9.     Life Insurance.

Dr. Gallups RESPONSE:     Dr. Gallups does not qualify for additional life insurance, due to health reasons (cancer). If he is able to assign part of a current policy to Dr. Jennings until she is paid the $10,250,000.00 she is owed under the Settlement Agreement, he will do so. Payment on the original policy owned by Dr. Jennings will be her responsibility once she is paid the $10,250,000.00.

Frank Strickland, Esq.
July 7, 2023
Page 5

     10.     Corporate Transfer Documents Previously by Dr. Gallups.

Dr. Gallups RESPONSE:     Agreed, with the Marble Management LLC agreement forthcoming from Bernie Grondin, Esq.

     11.     Special Master Authority Over Marble Management, LLC.

Dr. Gallups RESPONSE:     At transfer there is no provision for a special master over Marble Management, LLC with the new owner.

     12.     Remaining Terms of Settlement Agreement.

Dr. Gallups RESPONSE:     Agreed.

     13.     Superior Court's Jurisdiction.

Dr. Gallups RESPONSE:     The parties will come to agreement and the contempt action will be dismissed. The Superior Court Jurisdiction shall still apply.

     Finally, without going through paragraph-by-paragraph objecting to or in response to your July 2, 2023 status report as Special Master, Dr. Gallups disputes many statements therein, but in particular the statement that he has been hesitant to disclose, or has not disclosed documents requested on financial status.  Attached to this letter are the latest financial updates from Adam Holzhauer, VP of Finance of Milton Hall Surgical Associates, LLC.

     Please note that the summary distillation for 2021-2022 is as follows:

| | | |
|---|---|---|
| Distribution | $920,000.00 | |
| Payments to the Department of Justice | $2,122,000.00 | |
| Insurance | $1,637,708.46 | |
| Nancy Jennings | $1,765,000.00 | |
| Personal Expenses | $392,351.88 | |
| Settlement/Legal | $25,000.00 | |
| Taxes | $778,515.98 | |
| TOTAL | | $7,590,576.32 |

     If there is a document that has been requested, but not produced, please advise.  However, the documents that are attorney client privileged and those produced by Dr. Gallups to the Department of Justice in his federal criminal case are not within his authority or discretion to produce.  The U.S. Attorney's office would need to approve the release of these documents to you.

     Please consider the above and respond accordingly.

Frank Strickland, Esq.
July 7, 2023
Page 6

Very truly yours,

**MARTENSON, HASBROUCK & SIMON LLP**

Peter V. Hasbrouck

PVH/jbg
Enclosures

cc:    Elizabeth Lindsey, Esq. (via e-mail only; w/encls.)
       Dr. Jeffrey Gallups (via e-mail only; w/encls.)



DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC  20201



**June 30, 2023**

Jeffrey M. Gallups
205 Hendricks Isle
Fort Lauderdale, FL  33301

Dear Jeffrey M. Gallups:

RE:  OIG File Number 4-17-40305-9

Effective 20 days from the date of this letter, the Office of Inspector General (OIG) of the Department of Health and Human Services is excluding you from participation in all Federal health care programs, as defined in section 1128B(f) of the Social Security Act (Act), for a minimum period of 10 years.

The OIG is imposing this exclusion under section 1128(a)(3) of the Act, due to your felony conviction (as defined in section 1128(i) of the Act) in the United States District Court for the Northern District of Georgia, Atlanta Division, of a criminal offense related to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct, in connection with the delivery of a health care item or service, or with respect to any act or omission in a health care program (other than Medicare and a State health care program) operated by, or financed in whole or in part, by any Federal, State or local government agency.  See 42 U.S.C. 1320a-7(a)(3), 42 C.F.R. 1001.101(c).

We have considered the information furnished to the OIG in response to our letter to you.

Section 1128(c)(3)(B) of the Act provides that the minimum period of exclusion shall be not less than 5 years.  Your period of exclusion is greater because our records contain evidence of the following aggravating circumstance(s):

1.     The acts resulting in the conviction, or similar acts, caused, or were intended to cause, a financial loss to a government agency or program or to one or more other entities of $50,000 or more.  (The entire amount of financial loss to such government agencies or programs or to other entities, including any amounts resulting from similar acts not adjudicated, will be considered regardless of whether full or partial restitution has been made.)  The court ordered you to pay approximately $700,100.00 in restitution.

2.     The acts that resulted in the conviction, or similar acts, were committed over a period of one year or more.  The acts occurred from about September 2015 to about June 2017.

3.     The sentence imposed by the court included incarceration.  The court sentenced you to 36 months of incarceration.

Page 2 – Jeffrey M. Gallups

We have taken into consideration the following mitigating circumstance(s) when assessing your period of exclusion:

1. The individual's or entity's cooperation with Federal or State officials resulted in others being convicted or excluded from Medicare, Medicaid and all other Federal health care programs, additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses, or the imposition against anyone of a civil money penalty or assessment under 42 CFR part 1003.

Important information about your exclusion and your appeal rights is enclosed. You should read these documents carefully and retain them for future reference.

Sincerely,

WILLIAM ECHOLS

Digitally signed by WILLIAM ECHOLS

William T. Echols
Reviewing Official
Exclusions Branch

Enclosures

cc: Jeffrey M. Gallups
2365 Old Milton Pkwy, Ste 300
Alpharetta, GA   30009

Scott R. Grubman, Esquire
Chilivis Grubman
1834 Independence Square
Atlanta, GA   30338

cr



DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201



## <u>Please read carefully and retain this important information about your exclusion.</u>

You are excluded from participation in all Federal health care programs (FHCPs), as defined in section 1128B(f) of the Social Security Act (Act). <u>See</u> 42 U.S.C. § 1320a-7b(f); 42 C.F.R. § 1000.10. The Act defines a FHCP as any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (except the Federal Employees Health Benefits Program). State health care programs are defined in section 1128(h) and include plans and programs under titles XIX, V, XX, and XXI.

The effect of your exclusion is that no payment may be made by any FHCP (including but not limited to Medicare, Medicaid, and TRICARE) for any items or services furnished, ordered, or prescribed by you, including services that do not directly involve patient care. You also are prohibited from submitting or causing claims to be submitted to FHCPs for items or services you furnish, order or prescribe. This prohibition applies regardless of whether you receive payment directly from any FHCP or whether payments are received by an employer.

A violation of your exclusion may subject you to criminal prosecution and/or the imposition of civil monetary penalties and the denial of your reinstatement to the programs. <u>See</u> 42 U.S.C. § 1320a-7a(a)(1)(D); 42 U.S.C. § 1320a-7b(a)(3); 42 C.F.R. § 1001.3002(a)(2).

The Office of Inspector General (OIG) is required to notify all applicable State health care program agencies and state licensing agencies of your exclusion. Such agencies may impose additional sanctions under their own authorities. In addition, your exclusion will be posted on the OIG's List of Excluded Individuals/Entities, https://exclusions.oig.hhs.gov/.

This exclusion does <u>not</u> affect your rights or the rights of your family members to collect benefits to which you or they may be entitled as a beneficiary under any Federal program such as Medicare, Medicaid, or Social Security.

**Reinstatement to FHCP participation is not automatic. You will not be reinstated at the conclusion of your period of exclusion unless you apply to the OIG and are granted reinstatement. A request for reinstatement may be submitted by email to exclusions@oig.hhs.gov or by fax to at (202) 691-2298. Upon receipt of the request, the OIG will notify you of the information and documentation required to reach a decision on your reinstatement. Obtaining a state license to provide health care or a provider number from a Medicare contractor, a State Medicaid agency, or other Federal health care program does not reinstate your eligibility to participate in FHCPs.**

Additional information regarding the Exclusions Program, including the scope and effect of exclusion and the process for applying for reinstatement, is available on the OIG's website at https://oig.hhs.gov.

(5/22 Edition)

 

DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201

## HOW TO APPEAL YOUR EXCLUSION

You may appeal your exclusion and file a request for a hearing before an administrative law judge (ALJ) only on the issues of: (i) whether the Office of Inspector General (OIG) has a basis for the imposition of the sanction, and/or (ii) whether the length of exclusion is unreasonable. More information regarding exclusion appeals may be found at 42 C.F.R. Part 1005.

A request for hearing must be made in writing within 60 days of receiving the OIG's notice of exclusion. The date of receipt of the notice will be presumed to be five (5) days after the date of such notice unless there is a reasonable showing to the contrary. See 42 C.F.R. § 1005.2(c).

Your request for hearing must contain a statement as to the specific issues or findings of fact and conclusions of law with which you disagree, along with the basis for your contention that the specific issues or findings and conclusions are incorrect. See 42 C.F.R. § 1005.2(d).

Your request for a hearing should be filed with the Departmental Appeals Board through the Electronic Filing (E-Filing) System. Access to the E-Filing System and additional information regarding E-Filing instructions, procedures, and filing deadlines may be found at https://dab.efile.hhs.gov.

In the event you are unable to file a hearing request using the DAB E-Filing System, you may submit all of the required information by mail to:

> Department of Health and Human Services
> Departmental Appeals Board, MS 6132
> Civil Remedies Division
> 330 Independence Avenue, SW
> Cohen Building – Room G-644
> Washington, D.C. 20201

(5/22 Edition)

APPENDIX "4"

| Special Master's June 14, 2023, Summary of Acceptable Terms | Gallups' June 15, 2023, Response Accepting Special Master's Terms | Gallups' July 7, 2023, Reversal |
|---|---|---|
| As Special Master I will require that Marble LLC have three managing members: Melissa Moritz, Nancy Jennings, and Greg Hays. Nancy and Greg would have no liability under the promissory note. D&O insurance and audited financial statements will be required. Any employment agreement between Melissa and Marble would be subject to approval by the three managing members. The proposed seven-year provisions are unacceptable in that they would tie my hands in the performance of my duties as Special Master. **This is a Special Master requirement and is not negotiable** | On the issue of your request as Special Master that Marble, LLC have three managing members, Dr. Gallups and Melissa agree that Greg, Melissa and Dr. Jennings can be the three managing members | Dr. Gallups and Melissa Moritz are separate and distinct parties. Ms. Moritz is not a party to the lawsuit styled Nancy Jennings f/k/a Nancy H Gallups v. Jeffrey M Gallups, Superior Court of Fulton County; Civil Action File No. 2020CV337822 for which you have been appointed as Special Master, nor is she a party to the underlying divorce case styled Nancy H Gallups v. Jeffrey M Gallups, Superior Court of Fulton County; Civil Action File No.: 2016CV274575. Ms. Moritz has retained her own counsel, Skip Sugarman, Esq., and he will be contacting you on her behalf regarding your proposed term sheet and specifically respond on terms regarding her proposed involvement going forward. Bernie Grondin, Esq. is preparing an Operating Agreement for Marble Management, LLC for your review. Dr. Gallups' proposal, subject to review and input by Skip Sugarman on behalf of Ms. Moritz, would be that under the Operating Agreement of Marble Management, LLC, Ms. Moritz would be named the Sole Managing Member/Operator of the entity and would have complete authority over the Company's day-to-day operations, without any special member control or ability to direct business affairs (but with complete visibility as to all Company operations and finances provided by Ms. Moritz for Dr. Jennings) for five (5) years from the date of the Operating Agreement. |
| Jeff must pay $200,000 in non-taxable alimony to cover Nancy's past fees to date and any future fees incurred by her in concluding a deal and the enforcement of the deal and the Settlement Agreement. Nancy is willing to give him time, but would want a schedule of payments so that payment in full would be no later than March 2024. | On the issue of Dr. Gallups paying $200,000 in non-taxable alimony to Dr. Jennings (to cover past and expected future legal fees), Dr. Gallups is willing to have this be a term of the agreement to allow him to transfer ownership interest in MHSA, LLC and its related entities, but he (the business) will need terms beyond March 2024 in which to pay it due to the current level of cash flow in the business | Dr. Gallups has reconsidered and refuses to pay Dr. Jennings $200,000.00 in fees incurred with Ms. Lindsey since the onset of the ongoing underlying case before Judge Schwall. Ms. Lindsey has, for years now, tried to make payment of her fees a negotiating term on various issues and specifically on the issue of the ownership transfer of the Companies. Her requests for fees in numerous Motions filed over the last 24 months in the case before Judge Schwall, have either been outright denied by Judge Schwall (see Order dated May 20, 2021) or granted in part (despite requests for an amount much higher than awarded) and paid by Dr. Gallups (see Order dated November 3, 2021). These Orders were previously provided to you. Please take note that despite all |

| | | |
|---|---|---|
| | | of the constant and acute distress on the Companies and on Dr. Gallups personally, he remains compliant with a key component of the divorce Settlement Agreement, that is paying Dr. Jennings $65,000.00 per month in alimony. Despite the fact that Dr. Gallups is under tremendous personal and professional financial distress, he is NOT in Contempt. Payment of Dr. Jennings' attorney's fees is simply a tax being added onto a transaction that could have been completed in the last calendar quarter of 2022, before your appointment as Special Master in the case. |
| Jeff has agreed to reimburse Nancy on or before December 31, 2023 for her taxes and accountant fees for ASC income for which she was not provided K-1s or a tax distribution. To date, she has not received a 2021 or 2022 K-1 which she needs on or before 9/15/23. | Dr. Gallups has agreed on the tax and accounting fees on ASC regarding Dr. Jennings as per the terms of your email. | Dr. Gallups needs Dr. Jennings to advise him (and provide proof of same) of the CPA fees she has and will incur in amending her 2021 and 2022 tax returns. Dr. Gallups will provide Dr. Jennings with 2021 and 2022 K-ls by September 30, 2023 and reimburse her for $8,500.00 in taxes she has previously paid. |
| Nancy must receive an upside, including participation in any rollover, if the practices are sold for more than $50 million. The proposed upside calculation may work, but Nancy hasn't had time to evaluate it. | The "upside" participation for Dr. Jennings has been addressed in previous emails. Similarly, the additional life insurance issue has been addressed. I believe that there is an agreement on both issues. | Dr. Gallups agrees with this proposed term except disagrees with and disputes that the Special Master shall have the authority to adjust the principal amount of the note downward. As long as Dr. Jennings receives her monthly alimony, Dr. Gallups is compliant with the Court Order in place and is under no contractual obligation to sell the Companies on a date certain or for a price certain. |
| Jeff needs to provide additional life insurance so that Nancy is the unfettered and sole beneficiary of $10,250,000 in life insurance.  The terms of the $5 million insurance policy provided in the Settlement Agreement shall not change. | The "upside" participation for Dr. Jennings has been addressed in previous emails. Similarly, the additional life insurance issue has been addressed. I believe that there is an agreement on both issues. | Dr. Gallups does not qualify for additional life insurance, due to health reasons (cancer). If he is able to assign part of a current policy to Dr. Jennings until she is paid the $10,250,000.00 she is owed under the Settlement Agreement, he will do so. Payment on the original policy owned by Dr. Jennings will be her responsibility once she is paid the $10,250,000.00. |
| Jeff must pay the Special Master and the professionals I have engaged; Greg Hays and Dan Brown. **This is a Special Master requirement and is not negotiable** | Dr. Gallups understands that he must pay you as Special Master and Greg Hays and Dan Brown, but needs terms on those obligations as well as neither he or the business have the resources to pay now. | Dr. Gallups, however, understands, acknowledges and accepts your appointment as Special Master, and your desire to be paid, and for your designates to be paid as well. As will be discussed below and as evident from the latest numbers from Adam Holzhauer, VP of Finances for Milton Hall Surgical Associates, LLC provided with this letter, Dr. Gallups and the Companies will need payment terms to pay you and Mr. Hays. |

| | | |
|---|---|---|
| In my capacity as Special Master, among other duties, I'm charged with selling the practice for a reasonable price. As stated above, it is unacceptable to me for Melissa to be the sole managing member of Marble. I will require that there be two additional managing members of Marble: Nancy Jennings and Greg Hays. There would be indemnification of both by Jeff together with D&O coverage as stated above. At some point the amount of the promissory note ($50 million) may be viewed as excessive and could place a damper on a potential sale. There may be a need for an agreement to modify the promissory note to an amount the market will support. **This is a Special Master requirement and is not negotiable** | The terms on your role in the prospective sale of the practice are agreeable. You, of course, would have an ongoing role in all aspects, including to address the necessity to modify the 50MM promissory note that is part of the contemplated transaction at some point, if necessary. | As for your statement at Paragraph 2 (and its subparagraphs) that your stated terms on the formation and composition of Marble Management, LLC "is a requirement of the Special Master and non-negotiable," Dr. Gallups disagrees with and rejects same. He believes, and I agree with him, that your role as Special Master in the case does not provide you with the authority to take control of the Companies, and/or insert yourself as Special Master, Greg Hays as a designate or Dr. Jennings into an ownership or management position in same. Dr. Gallups agrees that Ms. Moritz should have an employment agreement on file and that the specifics of same should be in the Operating Agreement being prepared by Bernie Grondin, Esq.  …  Dr. Gallups requests that there be a "date of closure" on your involvement as Special Master and that the pending contempt case should ultimately be dismissed. The Companies cannot afford the ongoing involvement of a Special Master and numerous designates.  …  At transfer there is no provision for a special master over Marble Management, LLC with the new owner. |

APPENDIX "5"

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA


NANCY GALLUPS JENNINGS,     )
                            )
          Plaintiff,        )  CIVIL ACTION
                            )
vs.                         )  FILE NO.  2020CV337822
                            )
JEFFREY M. GALLUPS,         )
                            )
          Defendant.


- - -

TRANSCRIPT OF PROCEEDINGS

HONORABLE CRAIG L. SCHWALL ON JULY 20, 2023

IN ATLANTA, GEORGIA

- - -

APPEARANCES:

FOR THE PETITIONER:       PETER HASBROUCK, ESQ.
                          MARTENSON HASBROUCK & SIMON LLP
                          2573 APPLE VALLEY ROAD
                          ATLANTA, GEORGIA 30319

FOR THE RESPONDENT:       ELIZABETH LINDSEY, ESQ.
                          DAVIS MATTHEWS & QUIGLEY PC
                          3400 PEACHTREE ROAD NE, SUITE 1400,
                          ATLANTA, GEORGIA 30326




CANDICE SANDERS RPR, CCR, GRL
C. ELISE REPORTING, INC.
1860 SANDY PLAINS ROAD STE 206 #3063
MARIETTA, GEORGIA 30066.

1      THE COURT:  All right.  Who's going to recite?

2      MR. HASBROUCK:  We are not there, Judge.  We've got

3  some problems.

4      MS. LINDSEY:  As I understood it, Judge, you wanted us

5  to read it in the record, and then let Dr. Gallups say why he

6  wasn't going to do it.

7      THE COURT:  Well, tell me what you propose the deal is

8  and let's let Dr. Gallups respond.

9      MS. LINDSEY:  Thank you, Your Honor.  So, Your Honor,

10  there was a term sheet that was circulated reflecting the

11  deal that was reached between Mr. Strickland as Special

12  Master and Peter Hasbrouck with Dr. Jennings' approval.  This

13  term sheet is multiple pages and I will -- it's long, so I

14  will read it into the record.  It was a term sheet respecting

15  incremental transaction respecting Nancy Jennings,

16  Petitioner, versus Jeff Gallups, Respondent, Superior Court

17  Action Fulton County, Family Division Civil Action

18  2020SV337822.

19      The incremental term sheet summarizes the principal

20  terms proposed series of interim and incremental transactions

21  to effectuate in part the terms of the October 28, 2016

22  settlement agreement by and between Nancy H. Gallups, MD, AKA

23  Nancy Jennings, Dr. Jennings, and Jeffrey M. Gallups, MD, Dr.

24  Gallups, as incorporated in the January 4, 2017 final

25  judgment and decree entered in the Nancy H. Gallups,

1    Petitioner, versus Jeffrey M. Gallups, Superior Court of

2    Fulton County Family Division, Civil Action 2016CV274575 and

3    is directed and authorized by the Superior Court in Nancy

4    Jennings, Petitioner, versus Jeffrey Gallups Civil Action

5    2020CV337822.

6         The interim term sheet is acknowledged by Dr. Jennings,

7    Dr. Gallups, Frank Strickland only in his capacity as Special

8    Master appointed by the Court -- Superior Court February 8,

9    2023 order for appointment of Special Master entered in the

10   Civil Action 2020CV337822.  The Special Master and at times

11   collectively with Dr. Jennings and Dr. Gallups called the

12   parties.

13        The transactions are intended to be incremental in

14   nature and are not intended to resolve or satisfy fully or

15   the obligations of any party to the settlement agreement or

16   subject to the final judgement degree.

17        And I'm happy to give you a copy of this to verify as

18   you do that.

19        The transaction -- Dr. Gallups assignment to -- now

20   will be Dr. ▋▋▋▋▋▋▋ of his interest in the business in

21   the companies.  Immediately, Dr. Gallups will take all

22   necessary steps to assign and will assign to Dr. ▋▋▋▋▋▋▋

23   the entirety of his interest in ENTI Surgery Center, LLC,

24   Milton Hall Surgical Associates, LLC, Alpharetta Surgery

25   Center, LLC also known as Milton Hall Surgical Center,

1    collectively the companies.  The MHSA Management, LLC, will

2    transfer to Dr. ████████ 100 -- it's one person interest

3    in MHSA.  Each of the companies and Dr. Gallups will provide

4    ████████ full indemnification against any loss or damage

5    in connection with the transaction.  It's indemnification

6    shall not be limited to the assets or the value of the assets

7    of the companies.  The companies operating agreements will be

8    amended as necessary to provide Mr. ████████ full tax

9    distributions to pay all state, federal taxes including

10    without limitation income and withholding taxes.  The

11    companies will provide and pay for full coverage for

12    Dr. ████████.

13       Dr. ████████ will given the title and office of

14    medical director for each of the companies and will be

15    compensated upon terms consistent with healthcare industry

16    and agreed to by the parties as a condition precedent to the

17    transactions.

18       MR. HASBROUCK:  Elizabeth, can you wait for just a

19    moment?  Your Honor, I'd like to just -- when we get into

20    these provisions that Dr. Gallups -- just doesn't have the

21    capacity to comply with or otherwise disagrees with, I would

22    just like to state on the record where the problems are.

23       THE COURT:  Sure, you may.  As she proceeds, you may.

24       MR. HASBROUCK:  Yes, thank you.

25       MS. LINDSEY:  So Item 2, Marble Management, LLC.

1    Dr. Gallups will form Marble Management, LLC -- we're calling

2    it MM -- and will transfer or cause the transfer of MM of the

3    assets of Milton Hall Management, LLC.  The Dr. Gallups will

4    engage in transactions which result in Ms. Moritz owning 100

5    percent of MM membership interest.

6        MR. HASBROUCK:  And that's a problem, Your Honor,

7    because Dr. Gallups -- although, his intention and goal is to

8    do so -- Ms. Moritz is not a party to this litigation.  She

9    is represented by Skip Sugarman.  They're not here today, so

10   he can't sign something --

11       THE COURT:  Well, has he gotten a preliminary approval

12   from her?

13       MR. HASBROUCK:  He's talked to her about it in the

14   phone -- on the phone and the abstract sounds like something

15   she will agree to.  But in terms of her signing off on this

16   at this juncture, she is not ready to do it.

17       THE COURT:  Okay.  I understand that.  That's so noted.

18   That's what we hope the agreement will be.

19       MR. HASBROUCK:  Yes.

20       MS. LINDSEY:  And so, Your Honor, I think for the

21   record, the documents that have been prepared by Mr. --

22   Dr. Gallups previously by his corporate counsel have already

23   -- have included that for -- we were provided that on July

24   11th, I think.

25       THE COURT:  We don't expect it to be a problem.

1        MS. LINDSEY:  I don't.

2        THE COURT:  Okay.

3        MR. HASBROUCK:  We don't know.

4        THE COURT:  We don't.  We hope so.

5        MR. HASBROUCK:  Can't speak for a nonparty.

6        THE COURT:  I understand.

7        MS. LINDSEY:  MM shall have four managing members --

8        MR. BROWN:  Board of members.

9        MS. LINDSEY:  And they're going to be called board of

10   members so if I --

11        MR. BROWN:  Board of managers.

12        MS. LINDSEY:  There will be four members who will be on

13   the board of managers.  And if I incidentally use the

14   managing members it is to be repeated as board of managers.

15   Those fours members of the board of managers are Dan

16   Smolczynski, Melissa Moritz, Dr. Jennings and Greg Hays.

17        MR. HASBROUCK:  If you pause just for a minute, we can

18   spell it.

19        THE COURT:  Okay.

20        THE RESPONDENT:  S-m-o-l-c-z-y-n-s-k-i.

21        THE COURT:  Thank you.

22        MS. LINDSEY:  The roles and responsibility, expectation

23   and authority of the board of managers shall be established

24   and incorporated into MM's operating agreement by terms of

25   which will be agreed among the board of managers.  Each board

1    of manager will have one vote on all matters and MM's

2    operating agreement will provide one majority vote

3    requirement.  Any deadlock will be determined by the Special

4    Master.

5        MR. HASBROUCK:  And we wanted to added in and/or Judge

6    Schwall.

7        THE COURT:  That's fine.

8        MS. LINDSEY:  That's acceptable.  That's acceptable.

9    Dr. Jennings, Dan Smolczynski and Mr. Hays will have no

10   liability under any promissory note created in connection

11   with the transactions --

12       MR. HASBROUCK:  And the issue there would be whether

13   that would extend on promissory note terms with Ms. Moritz.

14   You know, she is not mentioned there, but that is a

15   to-be-determined issue also.

16       THE COURT:  We don't expect anybody to be personally

17   liable --

18       MR. HASBROUCK:  Correct.

19       MS. LINDSEY:  The only personal liability, Your Honor,

20   is going to be that in this transaction, Dr. Gallups and

21   Ms. Moritz have worked out a deal where she is going to

22   get -- give him a $15,000,000 note for the sale of his

23   interest in the practice.  And that is between her and

24   Dr. Gallups.

25       THE COURT:  That's between them.

1        MS. LINDSEY:  That's between them.  But the other three

2   will have no liability on that note.

3        THE COURT:  Understood.

4        MS. LINDSEY:  Proof of the D&O insurance audited

5   financial statements will be required on an annual basis and

6   work frequently as requested by any member on the board of

7   managers.  Any employment agreement between MM and Ms. Moritz

8   and any other contract pursuant to which funds may flow from

9   MM to any other entity or person shall be subject to approval

10  by the board of managers.

11       MR. HASBROUCK:  With impasse resolved by Judge Schwall.

12  That's what we wanted to added in.

13       THE COURT:  That's fine.

14       MS. LINDSEY:  I think that's consistent with the prior

15  point.  MM shall provide and pay for full liability insurance

16  DO, et cetera, for the board of members -- managers.  The

17  members of the board of managers will be compensated for

18  their roles as managers and then each provision of this

19  section is a requirement and nonnegotiable by the Special

20  Master was the term street.  Item 3, alimony.

21       MR. HASBROUCK:  Can you hang on just one second,

22  Elizabeth.  Thank you.

23  (Whereupon, a brief discussion was held off the record.)

24       MR. HASBROUCK:  Go ahead.

25       MS. LINDSEY:  Okay.  Alimony.  The alimony -- it's

1    Number 3, alimony.  The alimony provision under the

2    settlement agreement are not modified or reduced in any

3    respect.  No. 4, Special Master fees and attorneys' fees

4    payable by Dr. Gallups.  No later than July 21, 2023,

5    Dr. Gallups shall pay at least one-half of all fees to date

6    by the Special Masters and the fees incurred by the Special

7    Masters retained professionals collectively the Special

8    Master fees, plus $25,000 to replenish the Special Master

9    retainer required Section 11 of the order of appointment of

10   Special Master.

11        I believe invoices -- Your Honor, this is not part of

12   the memo.  Invoices have been provided to Mr. Hasbrouck.

13   Dr. Gallups shall pay all future special master fees as

14   required by the order for appointment.  This provision is a

15   requirement.

16        MR. HASBROUCK:  And Judge, Dr. Gallups doesn't --

17   Dr. Gallups and/or the entities don't have the money now to

18   meet that requirement.

19        THE COURT:  For the half of the fees?

20        MR. HASBROUCK:  That's just...

21        THE COURT:  When can we make that requirement?

22        MR. HASBROUCK:  Well, I asked him -- now, we're

23   guessing but -- could you do it by October 31st?  Could you

24   -- he just doesn't know.  And that goes to the next paragraph

25   talking about Dr. Jennings --

1        MS. LINDSEY:  Don't get ahead.

2        MR. HASBROUCK:  But he doesn't have it.  He doesn't

3   have it.  There's nobody in this courtroom is being paid

4   currently including for my services; doesn't have the money.

5        THE COURT:  So what are we saying then?

6        MR. HASBROUCK:  Well, we don't know.

7        THE COURT:  Why don't we just reserve those issues.

8   They're going to have to be paid at some point.

9        MR. HASBROUCK:  Everybody --

10       THE COURT:  Let's just reserve those issues.

11       MS. LINDSEY:  Okay.

12       THE COURT:  And I appreciate you all working without

13   being paid for now.  Okay?  I want to resolve this case.  We

14   have all worked very hard.

15       MS. LINDSEY:  And, Your Honor, once I think -- if the

16   operating agreement gets in place and the board of managers

17   is available to look at, we will all have more clear

18   information.

19       THE COURT:  I understand.  This is just a road map.  I

20   understand.

21       MS. LINDSEY:  Dr. Gallups shall pay all attorneys' fees

22   incurred by Dr. Jennings and not paid by him previously which

23   as of June 15th was approximately $200,000 in the form of

24   nontaxable alimony.  The exact amount will be provided.  He

25   will agree to pay -- we propose that ten equal monthly

1   payments, which payment will be on the first day of each

2   month commencing July 1 --

3        THE COURT:  Can he abide by that?

4        MR. HASBROUCK:  No, he can't.

5        THE COURT:  All right.  Let's reserve that issue.

6        MR. HASBROUCK:  And also the issue of ongoing fees

7   incurred by Dr. Jennings going forward.

8        THE COURT:  Let's reserve all those issues.  We've made

9   big progress today, so let's reserve those financial issues.

10        MS. LINDSEY:  I want to be clear.  We are reserving the

11   payment of them, not the obligation.

12        THE COURT:  That's correct.  No.  We're not changing

13   the obligation.  We are just reserving how it's going to get

14   paid and when.

15        MS. LINDSEY:  Thank you, Your Honor.

16        MR. HASBROUCK:  Okay.  We -- we dispute that he has an

17   unending ongoing obligation to continue to pay all these

18   fees, but we can --

19        THE COURT:  All right.  That's noted and you can

20   reserve that.

21        MR. HASBROUCK:  All right.  Thank you.

22        MS. LINDSEY:  K-1s.

23        THE COURT:  You're not talking about past fees.  You're

24   talking about --

25        MR. HASBROUCK:  Going forward.

1     THE COURT:  -- going forward.

2     MR. HASBROUCK:  Yes.

3     THE COURT:  So we agree to the past fees, but we don't

4     agree to going forward and that can be reserved.

5     MR. HASBROUCK:  Well --

6     THE COURT:  And that can be decided by the special

7     master.

8     MR. HASBROUCK:  And/or Your Honor.

9     THE COURT:  That's correct.  All right, Elizabeth.

10     MS. LINDSEY:  K-1s.  By December 31, 2023, Dr. Gallups

11     will reimburse Dr. Jennings for all taxes including penalties

12     and interest and accounting fees respecting Alpharetta

13     Surgical Center income for which he was not provided K-1s and

14     did not receive a tax distribution.  Plus, Dr. Jennings cost

15     incurred in amending her tax returns.  Dr. Gallups will

16     provide Dr. Jennings with a 2021 and 2022 K-1 by September

17     30, 2023.

18     MR. HASBROUCK:  The issue there was defining the past

19     due obligation which had previously reported as $8,000.  He

20     disputes having to pay for her to amend her returns.  He did

21     agree to provide her with 2021 and 2022 K-1s.

22     MS. LINDSEY:  So, Your Honor, the reason she's had to

23     amend her returns is because he didn't give her a K-1 and she

24     got tax -- IRS tax notices.  She was unaware that she was

25     even being taxed on income.  And that's why she's had to

1    amend returns because he didn't give her the K-1 for her 1

2    percent interest --

3         THE COURT:  The items that we have reserved can either

4    be decided by the special master or the Court.

5         MS. LINDSEY:  Okay.  So you're reserving that?

6         THE COURT:  We are going to reserve that.  The main

7    thing I want today is the transfer.

8         MS. LINDSEY:  Right.  Okay.  Sale of the practice.  The

9    terms of paragraph 6 -- and this is Item 6 on our memorandum.

10   The terms of paragraph 6 of the settlement agreement will be

11   amended to require the preparing and marketing the company's

12   for sale and to permit the incremental transfer of the

13   companies as set forth in here.

14        Upon the sale of any and all the companies, Dr.

15   Jennings will receive the first $10,250,000 of the gross

16   sales proceeds in cash, to be paid directly to her at closing

17   as nontaxable alimony compliant with the settlement agreement

18   and subsequent court orders in this matter.

19        MR. HASBROUCK:  Excuse me, just a moment, Elizabeth.

20   And when Ms. Lindsey's referring to settlement agreement,

21   Your Honor, that is from Case No. 2016CV274575, which is the

22   divorce case.

23        MS. LINDSEY:  Correct.  Dr. Gallups will remain solely

24   responsible for the taxes associated with this payment to

25   Dr. Jennings and will pay same and indemnify and hold her

harmless from any liability.

The term sale is to include partial sale of loan or any other transaction as defined broadly in the settlement agreement. Dr. Jennings shall receive 50 percent from any sale of the companies for more than $50,000,000 including equity and earn-outs and any other form of compensation which will be taxable to her. That amount will be taxable to her.

MR. HASBROUCK: I think there was a paragraph skipped and that's the paragraph that refers to defining the term sale as to include a partial sale, loan or any other transactions as defined broadly in the settlement agreement. And, Your Honor, that's what we talking back in your chambers on -- if Dr. Gallups is able to obtain funds so as to pay Dr. Jennings $10,250,000 under the settlement agreement. We -- there's a debate about -- or at least it's in play as to whether that would be satisfied fully his obligations under the settlement.

THE COURT: I think it should if he goes out and gets money to pay it before a sale --

MR. HASBROUCK: Okay.

THE COURT: -- or a partial sale.

MS. LINDSEY: So, Your Honor, that is not the deal. So I want to be clear about that because this isn't something that was agreed to by the parties on June 15th; that Dr. Gallups agreed and he proposed that she gets 50 percent

1    of anything over and above $50,000,000 for this deal.

2         THE COURT:  Well, don't you think it's probably

3    unlikely that you're going to over$50,000,00 anyway?

4         MS. LINDSEY:  Well, Your Honor, I don't know.

5    Dr. Gallups is sitting there in the back of the room, in the

6    jury box telling us that he think it's going to be easily

7    $50,000,000, if not $75,000,000 and he is hoping for

8    $100,000,000.

9         THE COURT:  Are you willing to give her over

10   $50,000,000, half the proceeds?

11        MR. HASBROUCK:  No, that's not --

12        THE COURT:  Okay.  Look.  Listen.  We've got to

13   transfer these businesses.

14        MR. HASBROUCK:  Let's get it transferred.

15        THE COURT:  Let's transfer the business and we'll

16   reserve that issue, too.  Okay.  I just want to -- don't we

17   have a deadline with Medicare?

18        MR. HASBROUCK:  Yes.

19        THE COURT:  I just want to transfer them, and then we

20   can argue about other stuff later.

21        MS. LINDSEY:  And, Your Honor, I hear you, but the

22   issue is -- is for him to transfer them, Nancy has to agree.

23   And he's proposes, so for him to back out of this deal, Your

24   Honor -- he's going to come in and tell you that's not in the

25   settlement agreement.  You can't do that.  And I think he

1    would be right.  The only way you can do that is if it's

2    their agreement.  And if he's not going to agree, then that

3    puts Nancy in that spot of saying we don't have a deal

4    because this is the deal.  And he is --

5         THE COURT:  Well, I think both parties have so much to

6    lose here.  This is high stakes poker.

7         MS. LINDSEY:  I understand, Your Honor.

8         THE COURT:  And --

9         MS. LINDSEY:  But Nancy --

10        THE COURT:  I understand your point that if he doesn't

11   agree to it, then I can't force it.

12        MS. LINDSEY:  Right.  And so Nancy, you know, Your

13   Honor -- there's a lot about this.  But Nancy hasn't been

14   playing poker.  You saw the special master report.  I don't

15   have to tell you what that said.  She has been cooperating,

16   working, being reasonable, doing everything she could.  We've

17   been here today and we've never changed positions.  The

18   position on that side of the table have changed every minute

19   by the minute and it's whatever's convenient at the moment.

20        And so, Your Honor, we can't do this deal and I

21   understand it.  If we don't have the deal that we agreed to,

22   to make this deal happen.  And that's --

23        THE COURT:  I think that we need to figure something

24   out.  Clocks running.

25        MR. HASBROUCK:  I think we need to get the ownership

1    interest transferred or there's not going to be any deals to

2    discuss.

3         THE COURT:  What do you want to say, Dr. Gallups?

4         THE DEFENDANT:  We have papers ready to sign, that

5    Melissa's willing to sign, C███████ ready to sign today.

6         MS. LINDSEY:  And, Your Honor, that hasn't changed.

7    The fact of the matter is, I could have predicted 100 percent

8    that's what he was going to say because he wants to renege

9    the deal.  We got this term sheet out, Your Honor, and for

10   three weeks total silence.

11        THE COURT:  What will you agree to over $50,000,000?

12   Will you agree that she gets a third of over $50,000,000.

13        MR. HASBROUCK:  I think there's examples in there.

14   Let's just keep reading this, Judge --

15        MS. LINDSEY:  This is what the deal was, Your Honor.

16        THE COURT:  All right.  Do we have a deal for a certain

17   percentage over $50,000,000?  Yes.

18        THE DEFENDANT:  May I just --

19        THE COURT:  You may.

20        THE DEFENDANT:  The thought was I want to get her

21   $10,250,000 as you were present in the room.

22        THE COURT:  Right.

23        THE DEFENDANT:  And, hey, if we do that, let's just get

24   her paid and be done with it.  Right?  But what we want -- if

25   we pay her $10,250,000, I'm willing to give her above the 50

17

1    -- but all of this goes away.  We're solo.  We're no

2    supervision anything.  When we close if it's above

3    $50,000,000, she will get 50 percent.

4         THE COURT:  All right.  We got a deal.  Okay.  He just

5    said we have a deal.

6         MS. LINDSEY:  So this is what I understand -- and let

7    me think about this.  He is proposing that if he gave you the

8    $10,250,000, then the board of managers goes away and Melissa

9    is totally in control.  We would accept that as long as we

10   can be at the closing table and have full access to all

11   closing --

12        THE COURT:  And he's willing to give her 50 percent

13   over --

14        MS. LINDSEY:  Over $50,000,000.

15        THE COURT:  All right.  That's perfect.  We've got a

16   deal.  Let's go.  Keep going.

17        MS. LINDSEY:  Okay.  Do I need to read the examples

18   into the record?

19        MR. HASBROUCK:  No.

20        MS. LINDSEY:  Okay.  Nothing in this agreement, though,

21   would prevent a sale for less than $50,000,000 and

22   Dr. Jennings right to receive $10,250,000.

23        THE COURT:  Okay.

24        MS. LINDSEY:  The special master to remain until the

25   practice is sold.  The special -- the superior court order

1  for appointment of special master shall remain in full effect

2  and he -- the special master shall remain as appointed by the

3  order for appointment of special master following the

4  consummation of the transaction because the $50,000,000

5  promissory note may be excessive and tamper a potential sale,

6  there shall be an agreement to modify the amount as to what

7  the market will support.  And if an appraisal is necessary,

8  the companies will pay for the same.

9       MR. HASBROUCK:  And there's a dispute on that.  We --

10 he doesn't want to be the Special Master's order and the

11 settlement agreement doesn't compel a sale in any number.

12 And it's our position that if the special master -- that it

13 should be remain Dr. Gallups' decision as to --

14      THE COURT:  After he pays the $10,000,000.

15      MR. HASBROUCK:  After he pays the $10,000,000 or that

16 if they get an offer for $40,000,000 $35,000,000 that the

17 special master would be able to come in and make a decision

18 on that.

19      MS. LINDSEY:  Your Honor, I would agree once we get the

20 $10,250,000, the promissory note is no longer an issue.  But

21 until she's paid the $10,250,000 --

22      THE COURT:  I think we're on the same page.

23      MS. LINDSEY:  Until she's at -- then special master has

24 the right to determine this value.  Because if it's

25 unrealistic -- we will have a board of managers.  We are

1    going to have two people on each side of the table in theory;

2    two of them business people who are going to give good advise

3    to these people.  And if they get a good offer and they need

4    to take it and they can't agree, the special master or you

5    will come in and make a decision.

6         THE COURT:  That's fine.  That's good.  Okay.  Please

7    continue.

8         MS. LINDSEY:  We understand that Dr. Gallups is going

9    to execute or has executed a promissory note in the principal

10   amount $50,000,000 -- that Melissa Moritz was going to do the

11   promissory note -- sorry -- in favor of Dr. Gallups.  And

12   Dr. Gallups needs to prepare that note for review,

13   negotiation, approval by the Special Master and Dr. Jennings,

14   which it needs to comply with these terms that we're talking

15   about.

16        Promissory note will be subject to the authority of the

17   special master and shall include a provision that the

18   principal amount of the promissory note shall be placed --

19   shall be adjusted downward in the event the companies cannot

20   be sold in an amount sufficient to pay the promissory note in

21   full after satisfaction of the terms of the incremental

22   sheet, settlement agreement or if the special master's sole

23   determination promissory note without downward adjustment

24   will hinder the timely sale of the company.

25        This, of course, will not be modified -- this will be

20

1    in place until Dr. Jennings receives $10,250,000.

2        MR. HASBROUCK:  We have the same objections and

3    concerns about that type of authority by the special master

4    which we believe exceeds the scope of the order appointing

5    him as the special master.  But let's hope we have that

6    debate.

7        THE COURT:  Okay.

8        MR. HASBROUCK:  Let's hope we get to the point where

9    we're in the --

10       THE COURT:  Main thing I want today is the transfer.

11       MS. LINDSEY:  So, are we in agreement, though, that

12   until Nancy gets $10,250,000, the special master does have

13   that authority which, of course, is going to be based on the

14   recommendation of the board of managers; right?

15       THE COURT:  Is that agreeable?

16       MR. HASBROUCK:  Yes.

17       MS. LINDSEY:  Okay.  Life insurance.  Dr. Jennings will

18   become sole and primary beneficiary of an additional

19   $5,250,000 of insurance.  $5,250,000 in unencumbered life

20   insurance until she's paid $10,250,000 to protect her against

21   loss in the case of Dr. Gallups' death.

22       MR. HASBROUCK:  And he's willing to do that if it will

23   be approved by -- he has a serious illness, so he's got to be

24   approved by the carer, but he'll endeavor to do it.

25       MS. LINDSEY:  We understand there is a policy he wants

1    to assign to Dr. Jennings; is that correct?

2         THE DEFENDANT:  I want to assign part of a policy or

3    part of several policies and that's just a matter of getting

4    the privilege to do that.  I don't know that that could

5    happen.

6         THE COURT:  Well, that's the intent of the parties.

7    That's the intend and the good will of the parties.  Okay.

8         MS. LINDSEY:  All right.  And Dr. Gallups will timely

9    pay the premiums associated with those policies and provide

10   her proof of the beneficiary designations and payment of

11   premiums on a timely basis until the transaction is

12   completed.  And he will do that on an annual basis starting

13   with the date this transaction is done.  She -- and

14   Dr. Jennings will have the right to have direct access to the

15   insurer or insurers and to make sure the premiums are paid

16   and the correspondence if there's any attempt to change

17   beneficiary.

18        There is currently a $5,000,000 policy in place

19   provided for in the divorce settlement agreement, which is

20   not modified.  Those provision are not modified.  Corporate

21   transfer document.

22        MR. HASBROUCK:  Can you just pause for a second,

23   please.  So the terms of the -- our understanding is the

24   terms -- once he pays the $10,250,000 that the life insurance

25   goes away.

1      MS. LINDSEY:  That's not what the settlement agreement

2  provides on the existing policy.  We agreed on the 5,250,000.

3      THE COURT:  That goes away.

4      MS. LINDSEY:  That goes away.  What's under the

5  settlement agreement, does not go away.

6      THE COURT:  So she's going to get $15,000,000?

7      MR. HASBROUCK:  If he sells the company.

8      THE DEFENDANT:  Right now.  Yeah.

9      MS. LINDSEY:  No.

10      THE DEFENDANT:  May I explain?

11      THE COURT:  You may.

12      THE DEFENDANT:  So I'm offering to up the ante by

13  adding $5,250,000 more in case something happens to me.  But

14  I'm willing to do that because when she gets her $10,250,000,

15  I want both policies to go away.  I think that's a fair trade

16  off.

17      THE COURT:  I do, too.

18      MS. LINDSEY:  But that's not what the settlement

19  agreement provides.  It's her policy already.  She's the

20  owner.

21      THE COURT:  So she's going to get $10,250,000 and

22  $5,000,00 more if he dies.

23      MS. LINDSEY:  But she's the owner.  She owns -- that's

24  an asset.

25      THE COURT:  Who's paying the premiums?

1      THE DEFENDANT:  Me.

2      MS. LINDSEY:  He is.

3      THE DEFENDANT:  That's the trade off.

4      THE PLAINTIFF:  No, that's the agreement.

5      MS. LINDSEY:  He's saying he's not going to do the

6  other way.

7      THE PLAINTIFF:  That would modify my settlement

8  agreement.  The settlement agreement can't be modified.

9      MS. LINDSEY:  What are the premiums for the

10 $5,000,000 --

11     MR. HASBROUCK:  Let's come back -- let's reserve that,

12 too.  Let's get it transferred.

13     THE COURT:  Let's reserve that.  Okay.

14     MS. LINDSEY:  The parties -- the next paragraph 10 is

15 the parties corporate transfer documents previously provided

16 by Dr. Gallups.  The parties agree to and shall cooperate in

17 good faith in the expeditious negotiation, preparation,

18 execution of all the documents required to consummate the

19 transaction.  Eleven, special master authority over Marble.

20 The parties have expressively agreed that the special

21 master's authority over MM shall be equal to the special

22 masters authority over the companies as provided in and by

23 the order for appointment of special master.

24     MR. HASBROUCK:  With the addition that you have the

25 ultimate role, arbiter role, Your Honor.

1      THE COURT:  I understand.  That's fine.

2      MS. LINDSEY:  Twelve, all remaining terms of the

3  settlement agreement are not specifically modified, remain

4  unchanged.  Dr. Jennings retains all interest under and in

5  connection with her UCC-1 filings and the pledge agreement as

6  provided in the superior court's order of -- in this case --

7  dated February 17, 2021, and also such interest shall extend

8  to the assets of MM.

9      Superior court jurisdiction.  The parties, the

10  companies and MM stipulate to the jurisdiction superior court

11  over each of them in these matters until Dr. Jennings is paid

12  in full.  The companies and MM submit to the jurisdiction of

13  superior court and its contempt and enforcement powers.  And

14  that is the term sheet, Your Honor.

15      THE COURT:  All right.  Except for everything we

16  reserved, do you agree to that, Pete?

17      MR. HASBROUCK:  And what other -- and the other stated

18  objections.

19      THE COURT:  I understand.

20      MR. HASBROUCK:  And the fact that Ms. Moritz is --

21      THE COURT:  Yes, sir, Dr. Gallups.

22      MR. HASBROUCK:  -- is a non-party.

23      THE DEFENDANT:  You know, my concern is in order to get

24  this done with -- according to my attorneys McDermott, Will &

25  Emery that Marble has to be signed and the special doctor

1    paperwork has to be signed in total to make this transfer.

2    And I want to make that very clear.  Right now what's being

3    proposed is to not send the document from Marble, and we

4    can't compel Ms. Moritz to sign that document.  She's

5    represented by counsel.  So we're at an impasse in my

6    opinion.  The only thing we can do to today to save this

7    company is to have both sets of documents signed as are

8    currently provided by McDermott Will & Emery.

9         MS. LINDSEY:  So, Your Honor, I -- and Dan Brown can

10   probably speak to this better than I can.  The thing that

11   does need to happen and we think it's today -- but, Your

12   Honor, it's a moving target apparently because it was --

13   there have been about four or five other previously deadline

14   that really weren't deadlines.

15        We need to -- we want the C█████████ assignment,

16   transfers of the three medical practice entities accomplished

17   today and the information provided to Palmetto.  We haven't

18   seen --

19        THE COURT:  Is that possible?

20        THE DEFENDANT:  It's possible, but it's not done yet.

21   We are still in the throws of that.

22        MS. LINDSEY:  And the only other document that needs to

23   be signed would be Dr. Gallups transferring his interest in

24   the management company to Melissa Moritz.  We don't have to

25   have the operating agreement finalized; right?  We just need

1   the transfer of --

2        THE COURT:  Let's do those.

3        THE DEFENDANT:  And she would have to accept it.

4        THE COURT:  All right.  I assume you have a good

5   relationship with her?

6        THE DEFENDANT:  Well, I'm trying but she's represented

7   by counsel.

8        MR. HASBROUCK:  All we can affirm and state that we're

9   endeavoring to do it and we hope she'll do it.  We can't make

10   a nonparty sign something, but that's the collective goal to

11   preserve the companies.

12        MS. LINDSEY:  Your Honor, and it's always been his

13   position.  I mean, this has been going on forever, since

14   October of 2022.

15        THE COURT:  If she doesn't sign it, then the deal goes

16   away and I think the company will be destroyed.  So I think

17   that everybody's got an interest of what's being discussed

18   here today transpiring.

19        MS. LINDSEY:  I agree.

20        THE DEFENDANT:  And I think we ought to sign -- she

21   only -- as far as -- the only thing I can confirm with you is

22   she's willing to sign the documents that are present today.

23        MS. LINDSEY:  Go ahead, Dan.

24        MR. BROWN:  Daniel Brown.

25        THE COURT:  And tell me who you represent, sir.

1    MR. BROWN:  I will.  Daniel Brown.  I'm with Taylor

2    English Duma and I've been retained by the special master as

3    a special master designant, I believe, counsel for the

4    special master.

5    THE COURT:  Okay.  And what do you want to tell us,

6    please.

7    MR. BROWN:  I think Dr. Gallups made the representation

8    that Ms. Moritz would sign the documents as presented by

9    McDermott Will & Emery on the table right now today.  Those

10   documents in particular, one document; the operating agreement

11   of the new operating company, Marble Management -- that document

12   does not contain the terms as were just discussed here in this

13   courtroom.  So if Ms. Moritz were to sign that operating

14   agreement, it would exclude the independent directors.

15   THE COURT:  How can we satisfy both of you?

16   MR. HASBROUCK:  I don't know.  She has to see it.

17   THE COURT:  Who is going to prepare that document?

18   MR. BROWN:  Those documents are prepared by

19   Dr. Gallups' counsel, McDermott Will & Emery.

20   THE COURT:  We need to modify those to include these

21   terms.

22   MR. BROWN:  Exactly.

23   MR. HASBROUCK:  And then she needs to look at it and

24   decides whether she'll sign it.

25   THE DEFENDANT:  Correct.

1          MR. HASBROUCK:  So if --

2          THE COURT:  Let's get this transcript to your lawyers.

3     If you can get this ASAP, please, madam court reporter, and

4     let's get this transcript to those lawyers.  Can we get it

5     tomorrow?

6          THE COURT REPORTER:  Sure.

7          MS. LINDSEY:  Your Honor, we all have drafts.  We have

8     said some things on the record, I think we can easily modify.

9     Everybody has it physically in their hand what they need.

10    And we believe -- although, we don't know -- that the

11    assignments for the friendly doctor -- for the medical

12    director issue probably are done.  The operating agreement

13    for the management company as a matter of Medicare issue does

14    not have to be done today.

15         THE COURT:  All right.  Well, let's get done what we

16    have to do which is the transfers.

17         MR. HASBROUCK:  Okay.

18         THE COURT:  Let's get the transfers done and then let's

19    execute whatever necessary documents.

20         MR. HASBROUCK:  And then we'll do our best to see what

21    Ms. Moritz will agree to.

22         THE COURT:  Well, time is of the essence.

23         MR. HASBROUCK:  Exactly.

24         THE COURT:  Now I'm available tomorrow by Zoom or

25    however you-all want to do, if we need to do that.  I think

1    that the parties having to be physically present here has

2    helped move this case along.

3         MR. HASBROUCK:  I agree.

4         THE COURT:  And I know there are a travel expenses, but

5    I do think the physical presence with the lawyers and special

6    master helps.  So let's -- do we want to have a status

7    conference tomorrow at 2 o'clock since they're in town?

8         MS. LINDSEY:  Let me double check.

9         MR. HASBROUCK:  Let's do it by Zoom at 2 o'clock.

10        THE COURT:  Mr. Strickland, are you available?

11        THE WITNESS:  I'm going to be in Madison tomorrow, but

12   I'll make myself available.

13        THE COURT:  Can we do it by Zoom tomorrow?

14        MS. LINDSEY:  Yes, Your Honor.

15        THE COURT:  All right who sets that up?  Do we?  Do

16   you-all or what?

17        MS. LINDSEY:  Your Honor, I have a zoom account.  I can

18   certainly add people.

19        THE COURT:  Can you do that and send me a link?

20        MS. LINDSEY:  Yes, Your Honor.

21        THE COURT:  You have my e-mail.  It's

22   craig.schwall@fultoncountyga.gov.  And, Frank, you will be

23   available at 2:00?

24        MR. STRICKLAND:  Yes.

25        THE COURT:  Let's say 2:30.  I've got a heavy day

1    tomorrow.  Let's say 2:30.  Okay?  Now, the reason we're here

2    -- and I think today has been a big success -- is because you

3    have excellent attorneys that have done a great job for each

4    of you.  And so I appreciate all courtesies and

5    professionalism.  Okay?  So 2:30 tomorrow.  Please send me a

6    link and the court reporter will get you a copy of this at

7    the 2:30 Zoom.  Okay?

8         MR. HASBROUCK:  Okay.

9         MS. LINDSEY:  So, Your Honor, just for clarity -- my

10   client asked are we going to sign.  It's my clear

11   understanding that everything that was read on the record

12   that wasn't reserved is an agreement and that it's not signed

13   because we're here.  If you -- all want to -- Judge, maybe

14   you swear in the parties and have them do it under oath.

15        THE DEFENDANT:  But there are too many moving pieces I

16   can't commit to.

17        MS. LINDSEY:  Except for those reserved ones --

18        THE COURT:  Except for the ones we reserved, you ought

19   to be able to agree.

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Okay.  I'll have both parties please stand

22   and raise your right hands.  Do you swear or affirm the

23   testimony you give before this court is the truth the whole

24   truth and nothing but the truth so help you God?

25        THE DEFENDANT:  I do.

1          THE COURT:  Dr. Gallups, everything that we've said

2     that your attorney has not reserved for ruling by the special

3     master and or the Court you agree to?

4          THE DEFENDANT:  To the best of my knowledge right now,

5     I do, Your Honor.

6          THE COURT:  All right.  Dr. Jennings?

7          THE PLAINTIFF:  I do.

8          THE COURT:  Okay.  All right.  I'll see you all at 2:30

9     on Zoom tomorrow.  You all have a good day.

10          (Whereupon, proceedings concluded at 2:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4                    I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the questions and

6    answers thereto were reduced to typewriting under my direction;

7    that the foregoing pages are a true, complete, and correct

8    transcript of the evidence given upon said proceedings, and I

9    further certify that I am not of kin or counsel to the parties

10   in the case; am not in the regular employ of counsel for any of

11   said parties; I am not in any way interested in the result of

12   said case.

13

14

15                   This, 20th day of July, 2023.

16

17

18

19                   Candice Sanders RPR, GRL, CCR-2847

20

21

22

23

24

25

APPENDIX "6"

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA


NANCY GALLUPS JENNINGS,    )
                           )
          Plaintiff,       )  CIVIL ACTION
                           )
vs.                        )  FILE NO.  2020CV337822
                           )
JEFFREY M. GALLUPS,        )
                           )
          Defendant.

- - -

TRANSCRIPT OF HEARING

HONORABLE CRAIG L. SCHWALL ON JULY 21, 2023,

IN ATLANTA, GEORGIA

- - -

APPEARANCES:

FOR THE PETITIONER:      PETER HASBROUCK, ESQ.
                         MARTENSON HASBROUCK & SIMON LLP
                         2573 APPLE VALLEY ROAD
                         ATLANTA, GEORGIA 30319

FOR THE RESPONDENT:      ELIZABETH LINDSEY, ESQ.
                         DAVIS MATTHEWS & QUIGLEY PC
                         3400 PEACHTREE ROAD NE, SUITE 1400,
                         ATLANTA, GEORGIA 30326


CANDICE SANDERS RPR, CCR, GRL
C. ELISE REPORTING, INC.
1860 SANDY PLAINS ROAD STE 206 #3063
MARIETTA, GEORGIA 30066

1      THE COURT:  Good afternoon, everybody.

2      MS. LINDSEY:  Afternoon, Judge.

3      THE COURT:  Tell me what's going on.

4      MR. HASBROUCK:  Judge, Hasbrouck here, Dr. Gallups is

5  with me.  So encouraging updates -- I'll just run down -- I

6  already told everybody else on the call, Your Honor.  So

7  Dr. ██████████ is signing the friendly doctor as we speak.

8  He was in clinic.  I told Ms. Lindsey and Mr. Strickland who

9  this lawyer is.  His name is Douglas Grimm out of ArentFox

10  Schiff in DC.  Those documents once signed by Dr. ████████

11  and Dr. Gallups will be sent to Mr. Strickland, Dan Brown and

12  Ms. Lindsey.

13      Tony Maya will use them for the updates on the appeal,

14  revocation of Medicare and Medicaid.  The Marble Management

15  operating agreement has been revised or is being revised

16  right now by Mr. Brown's office to effectuate what we talked

17  about managing members yesterday; Dr. Jennings, Greg Hays,

18  Melissa Moritz, Dan Smolczynski with the special master

19  Mr. Strickland and Your Honor governing in case there is an

20  impasse.  (Indiscernible).

21      THE COURT:  Hang on one, second.  I have to somewhat

22  turn up my volume so the court reporter can hear us.  Okay.

23  Go ahead, Pete.

24      MR. HASBROUCK:  Did you hear everything I said?

25      (Whereupon, the record was read back.)

1       THE COURT:  We talked about the tie breaker if there's

2    an impasse.  So please speak up a little more, Pete.

3       MR. HASBROUCK:  So if there is an impasse on the Marble

4    Management LLC's operating agreement, it will be -- the

5    impasse will be broken by special master, Mr. Strickland,

6    and/or Your Honor, Judge Schwall.  And then those -- that

7    revised operating agreement to memorialize what was read into

8    the record yesterday is being sent to all counsel of record;

9    Mr. Strickland, Ms. Lindsey, Greg Hays, Dan Brown of

10   Mr. Strickland's office.  I guess, Mr. Ressick of

11   Mr. Strickland's counsel.

12      And then Skip Sugarman who will be Ms. Moritz's counsel

13   who is on leave and we'll be sending it to him, too.  And

14   she's indicated favorably with what has been relayed to her

15   by Dr. Gallups.  But she's got to, you know, -- Mr. Sugarman

16   will have a review it, too.  So the update is all

17   encouraging.  There's nothing from yesterday that -- where we

18   don't have an agreement and we're not making progress --

19      THE COURT:  Ms. Lindsey, do you have anything you want

20   to say?

21      MS. LINDSEY:  No.  I just want to be clear since we

22   have a court reporter.  My understanding is that the Melissa

23   is going to -- Jeff is going to transfer his management

24   interest to Melissa which that interest will then be governed

25   incrementally by the operating agreement that's currently

1    amended.  But that the transfer to Melissa can go ahead and

2    take place and that the OIG exclusion issues won't impact any

3    of the practices.

4         THE COURT:  I think that's a good idea.

5         MR. HASBROUCK:  Judge, I understand that to be the case

6    but I am deferring (indiscernible) actual lawyer on that.

7         THE COURT:  I understand.  We all have good intentions.

8    That's good.  Well, then these issues that we have reserved,

9    hopefully, we can try to work through them and work them out.

10   I do realize that Ms. Lindsey you don't really want anything

11   to alter the settlement agreement except for what we

12   discussed yesterday.

13        MS. LINDSEY:  That's correct, Your Honor.

14        THE COURT:  All right.  I'm thrilled to hear this news.

15   And if you need, let's look into mid August.  Okay.  My court

16   reporter has the transcript ready.  She's going to send it to

17   you all but we need to get her paid.

18        COURT REPORTER:  Has the transcript ready she's going

19   to send it to you all but we need to get her paid.

20   (Whereupon, a brief discussion was held off the record.)

21        MR. STRICKLAND:  Hold on, Your Honor.  I am in Madison,

22   Georgia today and I don't have a camera on my screen.  But I

23   wanted to ask you, if you would, restate how you intend to

24   deal with the items that were stated on the record yesterday

25   as being reserved?

1          THE COURT:  Well, I think that you ought to hear those

2     issues and make a recommendation to the Court.  And if

3     somebody objects to what you're recommendation is, then they

4     can take it up with me.

5          MR. STRICKLAND:  Fine.

6          THE COURT:  Fair enough, everybody?

7          MR. STRICKLAND.  That clarifies with me.

8          MS. LINDSEY:  Yes.  Thank you, Judge.

9        (Whereupon, proceedings concluded at 2:49 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4                    I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the questions and

6    answers thereto were reduced to typewriting under my direction;

7    that the foregoing pages are a true, complete, and correct

8    transcript of the evidence given upon said proceedings, and I

9    further certify that I am not of kin or counsel to the parties

10   in the case; am not in the regular employ of counsel for any of

11   said parties; I am not in any way interested in the result of

12   said case.

13

14

15                   This, the 4th day of August, 2023.

16

17

18

19   Candice Sanders RPR, GRL, CCR-2847

20

21

22

23

24

25

# APPENDIX "7"

**Revised based on July 20, 2023  Hearing and  July 21, 2023 Status Conference**
**TERM SHEET**
**RESPECTING INCREMENTAL TRANSACTIONS RESPECTING *NANCY JENNINGS,***
***PETITIONER, VS. JEFFREY GALLUPS, RESPONDENT*, SUPERIOR COURT OF**
**FULTON COUNTY, GEORGIA, FAMILY DIVISION, CIVIL ACTION NO.**
**2020CV337822**

JUNE ___, 2023

This Incremental Term Sheet summarizes the principal terms of a proposed series of interim and incremental transactions (the "Transactions") to effectuate in part the terms of the October 28, 2016 *Settlement Agreement* by and between Nancy H. Gallups, M.D. *a.k.a.* Nancy Jennings ("Dr. Jennings") and Jeffrey M. Gallups, M.D. ("Dr. Gallups"), as incorporated in the January 4, 2017 *Final Judgment and Decree*, entered in *Nancy H. Gallups, Petitioner, vs. Jeffrey M. Gallups*, Superior Court of Fulton County, Georgia, Family Division (the "Superior Court"), Civil Action No. 2016CV274575, and as directed and authorized by the Superior Court in *Nancy Jennings, Petitioner, vs. Jeffrey Gallups*, Civil Action No. 2020CV337822.  This Interim Term Sheet is acknowledged below by Dr. Jennings, Dr. Gallups, and Frank B. Strickland, only in his capacity as Special Master appointed pursuant to the Superior Court's February 8, 2023, *Order for Appointment Of Special Master* entered in Civil Action No. 2020CV337822 (the "Special Master" and at times collectively with Dr. Jennings and Dr. Gallups, the "Parties").

The Transactions are intended to be incremental in nature and are not intended to resolve or satisfy fully or finally the obligations of any party to the Settlement Agreement or subject to the Final Judgment and Decree.

The Transactions are intended and summarized as follows:

1. **Dr. Gallups' Assignment to Dr. ~~Jennings~~ Q_____ of interests in the Companies.**

- Immediately, Dr. Gallups will take all necessary steps to assign and will assign to Dr. ~~Jennings~~ Q_____ the entirety of his interests in ENTI Surgery Center, LLC ("ENTI"), Milton Hall Surgical Associates, LLC ("MHSA"), and Alpharetta Surgery Center, LLC f/k/a Milton Hall Surgical Center ("ASC") (collectively, the "Companies").

- MHSA Management LLC will transfer to ~~Dr. Jennings~~Melissa Moritz its 1% interest in MHSA.

- Each of the Companies and Dr. Gallups will provide Dr. ~~Jennings~~ Q_____full indemnification against any loss or damage in connection with the Transactions.  This indemnification shall not be limited to the assets or the value of the assets of the Companies.

- The Companies' operating agreements shall be amended as necessary to provide Dr. Jennings and Dr. Q_____ with full tax distributions to pay all state and federal taxes, including without limitation all income and withholding taxes.

{02624798-1 }

- The Companies will provide and pay for full D&O insurance coverage for Dr. Jennings and Dr. C████████.

- Dr. ~~Jennings~~ C████████ will be given the title and office of Medical Director for each of the Companies and will be compensated upon terms consistent with the health care industry and agreed to by the Parties as a condition precedent to the Transactions.

## 2.   Marble Management, LLC

- Dr. Gallups will form Marble Management, LLC ("MM") and will transfer or cause the transfer to MM of the assets of Milton Hall Management, LLC ("MHM").

- MM shall have ~~three~~ four ~~Managing~~ Members of the Board of Managers: Melissa Moritz, Dan Smolczynski, Dr. Jennings, and Greg Hays.

- The roles, responsibilities, expectations, and authority of the Board of Managers ~~Managing Members~~ shall be established and incorporated into MM's operating agreement.

- Each member of the Board of Managers ~~Managing Member~~ shall have one (1) vote on all matters, and MM's operating Agreement will provide for a majority vote requirement. In the event of a deadlock, the Special Master or Judge Schwall shall be able to break the deadlock.

- Dr. Jennings and Mr. Hays and Dan Smolczynski shall have no liability under any promissory note created in connection with the Transactions.

- Proof of D&O insurance and audited financial statements will be required on an annual basis and more frequently as requested by any ~~Managing~~ Member of the Board of Managers.

- Any employment agreement between MM and Ms. Moritz and any other contract pursuant to which funds may flow from MM to another entity or person shall be subject to approval by the Board of Managers ~~three Managing Members~~. In the event of an impasse, the Special Master or Judge Schwall shall be able to break the impasse.

- 

- MM shall provide and pay for full liability insurance policies (D&O, etc.) for the Board of Managers ~~Managing Members.~~

- All members of the Board of Managers ~~Mr. Hays shall be compensated for his role as a Managing Member. No other Managing Member~~ shall be compensated for his/her role as a Managing Member.

- **Each of the provisions of this Section 2 is a requirement of the Special Master and is not negotiable.**

3.    **Alimony**

- ~~Dr. Jennings will receive the first 100% of the interest payments on the Promissory Note due to Dr. Gallups, not to exceed $65,000 per month, towards his obligation to pay alimony until Dr. Jennings is paid in full the $10,250,000 as set forth in the Settlement Agreement.~~

The alimony provisions under the Settlement Agreement are not modified or reduced in any respect.

4.    **Special Master Fees and Attorneys' Fees Payable by Dr. Gallups**

- ~~No later than July 1, 2023~~On such terms as determined by the Special Master, Dr. Gallups shall pay all fees incurred to date by the Special Master, and the fees incurred by the Special Master's retained professionals (collectively, the "Special Master Fees"), plus $25,000 to replenish the Special Master retainer required by Section 11 of the Order for Appointment of Special Master. The Special Master Fees as of June 20, 2023, are $_____. Dr. Gallups shall pay all future Special Master Fees as required by the Order for Appointment of Special Master. **This provision is a requirement of the Special Master and is not negotiable**.

- Dr. Gallups shall pay all attorneys' fees incurred by Dr. Jennings and not paid by Dr. Gallups of approximately $200,000.00 as of ~~June 15~~July 20, 2023, in the form of non-taxable alimony. The exact amount will be provided. ~~Dr. Gallups shall pay the agreed amount in ten (10) equal monthly payments, with each payment due by the first day of the month commencing on July 1, 2023, and continuing until all of Dr. Jennings' accrued attorneys' fees, including those incurred after June 15, 2023, are paid in full.~~The Special Master has the authority to determine the terms of the payments through this date and whether Dr. Gallups shall be required to pay ongoing fees thereafter.

5.    **K-1s**

- ~~By December 31, 2023,~~The Special Master shall determine the amounts that Dr. Gallups shall reimburse Dr. Jennings for all taxes (including penalties and interest) and accounting fees respecting ASC income for which she was not provided K-1's and did not receive a tax distribution, plus Dr. Jennings's costs incurred for amending her tax returns.

- Dr. Gallups shall provide Dr. Jennings a 2021 and 2022 K-1 by September 30, 2023.

6.    **Sale of the Practice**

- The terms of paragraph 6 of the Settlement Agreement CAFN 2016CV274575 will be amended to require preparing and marketing the Companies for sale, and to permit the incremental transfer of the Companies to Dr. ~~Jennings~~G████████and the terms of this term sheet.

- Upon the sale of any or all of the Companies, Dr. Jennings shall receive the first $10.25M of the gross sales proceeds in cash, to be paid directly to her at closing, as not-taxable

alimony in compliance with the Settlement Agreement and subsequent court orders in this matter.

- Dr. Gallups shall remain solely responsible for the taxes associated with this payment to Dr. Jennings and will pay same and indemnify and hold harmless Dr. Jennings from same.

- The term sale is to include a partial sale, loan, or any other transaction as defined broadly in the Settlement Agreement.

- Dr. Jennings shall receive 50% from any sale of the Companies for more than $50M, including equity and earn outs and any other form of compensation, which would be taxable to her.  Dr. Jennings's basis shall be equal to Dr. Gallups' and/or Ms. Moritz's basis for tax purposes. Dr. Jennings shall receive timely copies of all offers, closing statements and binders and has the right to be present at the closing of any such sale or transactions. The terms of this provision are in addition to the $10,250,000 owed to her, regardless of when such transaction and/or sale occurs.

- To illustrate this provision:

   **Example #1**: The Companies have an equity transaction that is valued at $75,000,000.  The cash out being 60% in this example.  $75MM at 60% is $45MM.  From that sum, Dr. Jennings will be paid $10,250,000. The remaining $34.75MM goes to Ms. Mortiz. In this scenario, Ms. Mortiz and Dr. Jennings then own equal amounts in the "roll forward" ownership with Dr. Jennings' portion being less by $5MM ($45MM plus $5MM is $50MM) to make Ms. Mortiz whole on her $50MM note.

   **Example #2**:  The Companies have an equity transaction that is valued at $80,000,000. The cash out in this example is 70%. $80MM at 70% is $56MM. Dr. Jennings will be paid $10,250,000 , plus ½ of the cash in excess of $50 million, *i.e.* $6MM will be paid half to Dr. Jennings, such that  Dr. Jennings will receive $13.25MM at closing. She will have tax liability on the additional $3MM. The "roll forward" ownership (or other form of equity/earnout/etc.) will be split equally between Dr. Jennings and Ms. Moritz.

- Nothing contained herein prevents a sale for less than $50 million and Dr. Jennings's rights to receive tax free the sum of $10,250,000.

**7.**     **Special Master to Remain until Practice Sold After Ownership by Dr. Jennings**

- The Superior Court's Order for Appointment of Special Master shall remain in full effect and the Special Master shall remain as appointed by the Order for Appointment Of Special Master following the consummation of the Transactions.

- Because the $50M Promissory Note (discussed below) may be excessive and damper a potential sale, there will be an agreement to modify the amount as to what the market will support.  If an appraisal is necessary, the Companies will pay for same.

- The parties agree that if at any time prior to the sale of the Companies, Dr. Gallups pays to Dr. Jennings the full sum of $10,250,000 tax free, then the Board of Managers and the Special Master provisions shall terminate.

**8.     $50M Promissory Note**

- As consideration for the transfers in Section 2 of this Incremental Term Sheet, MM shall execute a Promissory Note in the principal amount of $50M in favor of Dr. Gallups.

- Dr. Gallups shall prepare a form of Promissory Note for review, negotiation, and approval of the other Parties, to include the Special Master and D. Jennings.

- The Promissory Note shall be subject to the authority of the Special Master and shall include a provision that the principal amount of the Promissory Note shall be adjusted downward in the event the Companies cannot be sold in an amount sufficient to pay the Promissory Note in full after satisfaction of the terms of this Incremental Term Sheet, the Settlement Agreement or if in the Special Master's sole determination the Promissory Note without such downward adjustment will hinder the timely sale of the Companies. **This provision is a requirement of the Special Master and is not negotiable**.  This will remain in effect until Dr. Jennings receive $10,250,000, provided that the Promissory Note cannot increase beyond $50,000,000 so as to defeat Dr. Jennings' rights to participate in any proceeds in excess of $50,000,000 as set forth above.

**9. . Life Insurance**

- Dr. Jennings will be the sole and primary beneficiary of an additional $5,250,00 of unencumbered led life insurance on Dr. Gallup's life until she's paid $10, 250,000.  Dr. Gallups is to assign part of a policy or part of serval policies and shall present proof of his efforts to Dr. Jennings and the Special Master within 30 days and provide annual proof of the insurance and that all premiums are paid and that ere is no change of beneficiaries. Dr. Gallups shall authorize and direct the insurance company or companies to have direct access with Dr. Jennings and to be able to insure directly with the insurer or insurer that all premiums ar paid and current and that there is no change to the beneficiary as required hereunder and to receive all correspondence if there' any attempt to change beneficiary.

- The terms of the $5,000,000 life insurance policy under the Settlement Agreement remain in full effect and unchanged by the terms of this Agreement.  The issue of whether the Settlement Agreement can be modified as requested by Dr. Gallups for his obligation to pay the premiums on said policy after Dr. Jennings is paid the $10,250,000 by Dr. Gallups is reserved for the Special Master.

- 10.      All remaining terms of the Settlement Agreement remain  unchanged.

- 11.      Dr. Jennings retains all interest in the UCC-1 Filings and the pledge agreement as provided in the Court's Order dated February 17, 2021 and said security interest shall extend to the assets of Marble Management .

- 12.     The parties and MM stipulate to the jurisdiction of the Superior Court of Fulton County over each of them in this matter until Dr. Jennings is paid in full.

- 13.     The Companies and MM submit to the jurisdiction of the Superior Court of Fulton County  and its contempt and enforcement power.

- 14.     As of July 20, 2023, the assignments of the Companies to DR C█████  and the assignment of the management company to Melissa Moritz was to occur immediately.


All terms were agreed to by the parties under oath, except the terms that were initially reserved on July 20, 2023.  On July 21, 2023 it was agreed that the Special Master has the authority to resolve all reserved issues.


_____

9.    **Life Insurance**

- Dr. Jennings will become the sole and primary beneficiary of an additional $5,250,000 in unencumbered life insurance until she is paid her $10,250,000 to protect her against loss in case of Dr. Gallups' death.

- Dr. Gallups shall timely pay all premiums and shall provide Dr. Jennings and the Special Master proof of the beneficiary designation and payment of the premiums at or before the date of the Transactions and annually thereafter.

- Dr. Jennings shall be and hereby is authorized to have direct access to the insurer, to receive all premium notices and any correspondence that seeks to change the beneficiary.

- The terms of the $5M life insurance policy provided for in the Settlement Agreement shall not be modified without Dr. Jennings written consent.

10.    **Corporate Transfer Documents Previously Provided by Dr. Gallups**

- The Parties agree to and shall cooperate in good faith in the expeditious negotiation, preparation, and execution of all documents required to consummate the Transactions.

11.    **Special Master Authority over Marble**

- The Parties shall expressly agree that the Special Master's authority over MM shall be equal to the Special Master's authority over the Companies as provided in and by the Order for Appointment Of Special Master.

12.    **Remaining terms of the Settlement Agreement**

- All remaining terms of the Settlement Agreement not specifically modified herein shall remained unchanged.

- Dr Jennings shall retain all interests under and in connection with her UCC-1 filings and the Pledge Agreement as provided for in the Superior Court's February 17, 2021, order, and all such interests shall extend to the assets of MM.

13.    **Superior Court's Jurisdiction**

- The Parties, the Companies, and MM stipulate to the jurisdictions of the Superior Court over each of them and these matters until Dr. Jennings is paid in full.

- The Companies and MM submit to the jurisdiction of the Superior Court and its contempt and enforcement powers.

The undersigned hereby acknowledge the terms of this Incremental Term Sheet this _____ day of June, 2023.

**Nancy H. Jennings, M.D.:**

_____

**Jeffrey M. Gallups, M.D.:**

_____

**Special Master**

_____
Frank B. Strickland

APPENDIX "8"

*Confidential*

> **Note**: The Parties to Civil Action 2020cv337822 styled *Jennings v. Gallups* attended a Hearing before Fulton County Superior Court Judge Craig Schwall on July 20, 2024 (the "***Hearing***").  There the Parties agreed under oath to the terms and conditions of a purchase and sale transaction which were described to the Court and memorialized in the Transcript of Proceedings.
>
> On July 29, 2023, counsel for Defendant Gallups circulated transaction documents (the "***Gallups Documents***") which purport to reflect the terms agreed to the parties (but not necessarily Melissa Moritz) at the Hearing (the "***Terms***").  Below is a copy of the Amended and Restated Operating Agreement of Marble Management, Inc. as circulated as part of the Gallups Documents.  The markings appearing below highlight the discrepancies between the Terms and the document presented by Gallups' counsel.

> <u>Color Key</u>
> **Red**:     Items which directly conflict with the Terms.
> **Blue**:    Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue.
> **Green**:  Terms that were agreed but do not appear in the Gallups Document.

## AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## MARBLE MANAGEMENT, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT (this "<u>Agreement</u>") is made effective as of July ____, 2023 (the "<u>Effective Date</u>"), by and between Melissa E. Moritz, an individual residing in the State of Florida (the "<u>Member</u>"), and Marble Management, LLC, a Georgia limited liability company (the "<u>Company</u>").

1.      <u>Formation; Amendment and Restatement</u>.  The Company was formed on May 25, 2023 pursuant to the filing of a certain Articles of Organization with the Georgia Secretary of State.  This Agreement amends and restates the Prior Agreement in its entirety.  For purposes of this Agreement, the "<u>Prior Agreement</u>" means that certain Operating Agreement of Marble Management, LLC, dated May 25, 2023.

2.      <u>**Superior Court Jurisdiction**</u>.  **Nancy Jennings ("*Jennings*") and Jeffrey M. Gallups, M.D. ("*Gallups*") entered into that certain Divorce Settlement Agreement dated October 28, 2016, as amended (the "*Divorce Settlement*").  Until the completion of a Company Sale and/or payment of all funds and obligations due to Jennings under the Divorce Agreement, the operation of the Company, the expenditure of Company funds, and all Company actions related to the Company Sale shall be and remain under the jurisdiction of the Special Master and the Fulton County Superior Court in Civil Action No. 2020CV337822 and the orders issued therein, including an order appointing a Special**

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

**Master (as described in more detail below). Jurisdiction includes the Court's contempt and enforcement powers.**

3. <u>Principal Office and Place of Business</u>. The principal office and place of business (the "<u>Principal Office</u>") of the Company shall be such place as the ~~Member~~ Board of Managers from time to time shall determine.

4. <u>Term</u>. The term of the Company shall be perpetual, unless sooner terminated as provided herein.

5. <u>Agent for Service of Process</u>. The agent for service of process for the Company shall be Canopy Services, Inc., 3460 Preston Ridge Road, Suite 150, Alpharetta, Georgia 30005, or such other person or entity as the Member shall appoint from time to time.

6. <u>Purpose</u>. The Company shall have the power to pursue any and all activities necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of such purposes as are determined from time to time by the Member that are permissible under the Georgia Limited Liability Company Act, as amended (the "<u>Act</u>").

7. <u>Member</u>. The name and mailing address of the Member and the limited liability company interest held by the Member, are listed on <u>Schedule A</u> attached hereto.

8. <u>Distributions of Available Cash Flow</u>. Distributions of available cash flow shall be made in such amounts and at such times as the ~~Member~~ Board of Managers shall determine in the ~~Member~~ Board of Managers sole discretion.

9. <u>Management</u>.

(a) <u>General</u>. ~~Subject~~ In addition to the items set out in Section ~~8~~9(g) below, the business of the Company will ~~generally~~ be managed by a board of managers (the "<u>Board of Managers</u>" or the "<u>Board</u>"), who will consist of up to four (4) natural persons (each such person, a "<u>Manager</u>"). Except as set forth in this Agreement, the Board of Managers will have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. The Board of Managers, and the Persons constituting Board of Managers will be the "managers" of the Company for all purposes under the Act.

(b) <u>Composition</u>. The Board of Managers will initially be comprised of four (4) Managers ~~As determined by the Member~~ as follows: Melissa Moritz, Nancy Jennings, Greg Hays, and Dan Smolczynski will serve until their respective resignation, death, removal, or disqualification. Any Manager may resign at any time by delivering such Manager's resignation in writing to the Board of Managers. A Manager may be removed from office with or without cause by the vote of the Board of Managers.

(c) <u>Regular Meetings</u>. Regular meetings of the Board of Managers will be held at least once every sixty (60) days via Zoom, which meeting will take place after the 20th of the applicable month (each, a "<u>Regular Meeting</u>"). Written notice of a Regular Meeting will be distributed by Melissa Moritz or Dan Smolczynski, at least 96 hours in advance of the proposed

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

meeting date and time.  Any items that a Manager would like to discuss at a Regular Meeting will be provided via email to Melissa Moritz or Dan Smolczynski at least 48 hours in advance of the proposed meeting date and time.  Notwithstanding the foregoing, at each Regular Meeting, the Board will review the prior period's financial statements.

(d)     <u>Special Meetings</u>.  Special meetings of the Board of Managers may be held with written notice to each Manager stating the day and time of such meeting as well as the purpose of such meeting.  Special meetings may be called by any Manager with at least 96 hours prior written notice distributed to all Managers.

(e)     <u>Quorum, Attendance, and Adjournment</u>.  Except as may be otherwise provided by law, at any meeting of the Board of Managers for which the requisite advance notice has been given to the Managers (or waived), a majority of the Managers then in office will constitute a quorum.  Any meeting may be adjourned from time to time by a majority of the votes properly cast upon the question, whether or not a quorum is present and the meeting may be held as adjourned without further notice.

(f)     <u>Action by Vote</u>.  Except as may be otherwise provided by law and subject to the terms and conditions of this Agreement, when a quorum is present at any meeting of the Board of Managers, the vote of a majority of the Managers present will be the act of the Board of Managers.  Each Manager (present at a meeting) will have one (1) vote.  In the event of a deadlock among the Managers, such decision shall be made by the Special Master; provided that if at least two (2) of the Managers disagree with the decision of the Special Master, the deadlocked item will be determined by the Judge presiding over the Court Case.  For purposes of this Agreement, the "<u>Special Master</u>" will mean Frank B. Strickland, only in his capacity as Special Master appointed pursuant to the Superior Court's February 8, 2023, Order for Appointment Of Special Master entered in Civil Action No. 2020CV337822 (the "Court Case"), and any successor appointed by the Superior Court and "<u>Superior Court</u>" will mean the Superior Court of Fulton County, Georgia, Family Division.

**The roles, responsibilities, expectations, and authority of the Board of Managers shall be established and incorporated into this Operating Agreement by terms which will be agreed among the Board of Managers.  [This concept applies to all items addressed in this Section 9.]**

**Any employment agreement between the Company and Melissa Moritz shall be subject to approval by the Board of Managers.**

**Any contract pursuant to which funds may flow from the Company to any other entity or person shall be subject to approval by the Board of Managers[1].**

**The Company shall provide and pay for liability and D&O insurance for all of the Managers.**

---

[1] The Special Master specifically rejects the Company's taking any action to guarantee any promissory note of the Member in favor of Gallups

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

**The Company shall prepare audited financial statements annually for review by the Board of Managers.**

(g)    Member Control Rights.  Notwithstanding anything herein to the contrary, the Member (and not the Board of Managers) shall have exclusive decision making authority with respect to the following:

(i)    Running the day-to-day operations of the Company, including management and supervision of the policies of the Company, management and supervision of the financial affairs of the Company, and management and supervision of the employees of the Company;

(ii)    Hiring and firing executives and other employees, including physicians, the Chief Executive Officer, Chief Financial Officer, and Clinical Liaison;

(iii)    Entering into, amending, terminating, or otherwise modifying any Administrative Services Agreements, Deficit Funding Loan Agreements, Securities Transfer Restriction Agreements, or Clinical Liaison Agreements to which the Company is, or may become, a party;

(iv)    Negotiating and/or executing agreements with the Centers for Medicare & Medicaid Services ("CMS") and other insurers as it relates to the Company being eligible for payments and processing payments;

(v)    Subject to Section 13 as applicable, initiating, negotiating, and/or consummating a Company Sale, including engaging investment banker(s), counsel, accountants, and any other advisors to assist with such a transaction;

(vi)    Incurring, or amending the terms of, any secured or unsecured indebtedness; and/or

(vii)    Entering into any agreement to do any of the foregoing.

(h)    Compensation.  The Company acknowledges and agrees that the Board of Managers ~~Greg Hays and Dan Smolczynski~~ will each be entitled to receive payment for their role as a Manager in an hourly amount to be established by the Board.

(i)    Expiration. Notwithstanding anything in this Agreement to the contrary, the terms of this Section ~~8~~9 will automatically terminate, be null and void, and of no further force or effect upon the earlier to occur of a Company Sale (i) approved by unanimous consent of the Board of Managers; or (ii) in the amount of no less than $50,000,000.

10.    Officers.  The Board of Managers may appoint officers, from time to time, with such titles as the Member may select, including the titles of Chairman, Chief Executive Officer, President, Vice President, Treasurer, and Secretary, to act on behalf of the Company.  An officer

**Red**:      Items which directly conflict with the Terms.
**Blue**:     Items that were not part of the Terms and appear without agreement.  Plaintiff
              rejects all provisions highlighted in Blue.
**Green**:    Terms that were agreed but do not appear in the Gallups Document.

shall have such power and authority as the Member may delegate to any such person and need not be a Member of the Company.

11.     <u>Indemnification</u>.  The Company and its successors shall indemnify, defend, and hold harmless the Member, the Managers, and any officers of the Company (each, an "<u>Indemnitee</u>"), to the extent of the Company's assets, for, from and against any liability, damage, cost, expense, loss, claim, or judgment incurred by the Indemnitee arising out of any claim based upon acts performed or omitted to be performed by the Indemnitee in connection with the business of the Company, including without limitation, reasonable attorneys' fees and costs incurred by the Indemnitee in settlement or defense of such claims.  Notwithstanding the foregoing, no Indemnitee shall be so indemnified, defended, or held harmless for claims based upon acts or omissions in breach of this Agreement or which constitute fraud, gross negligence, or willful misconduct.  Amounts incurred by an Indemnitee in connection with any action or suit arising out of or in connection with Company affairs shall be reimbursed by the Company.  During the existence of the Company, the Board of Managers shall cause the Company to obtain, pay for, and not cancel a directors' and officers' liability insurance policy on terms reasonably agreed by the Board of Managers.

12.     <u>Liability</u>.  No Indemnitee shall be personally liable, responsible, accountable in damages, or otherwise to the Company for any act or omission performed or omitted by such Indemnitee in connection with the Company or its business.  The Member's liability for the debts and obligations of the Company shall be limited as set forth in the Act and other applicable law.

13.     <u>Reimbursable Expenses</u>.  The Company will reimburse the Member for all actual out-of-pocket third-party expenses incurred in connection with the carrying out of the duties set forth in this Agreement.

14.     <u>Sale of the Company</u>.

(a)     Absent ~~unanimous~~ consent of the Board of Managers, the Company shall not be sold for an amount less than $50,000,000.

(b)     In the event that (i) the Company has not initiated a Company Sale on or prior to the fifth (5th) anniversary of the Effective Date or (ii) the Company is in receipt of a written offer for a transaction contemplating a Company Sale which values the Company at more than $50,000,000, then, in each such case, <span style="color:blue">Dr. Nancy Jennings, an individual residing in the State of Florida ("<u>Jennings</u>"), will be entitled to appoint an individual to act as a special member of the Company (the "<u>Special Member</u>").</span>[2]

(c)     <span style="color:blue">The Special Member will be solely entitled to (A) in the event the Company is in receipt of a written offer for a transaction contemplating a Company Sale which values the Company at more than $50,000,000, call a special meeting of the Board of Managers) to cause the Company to take all reasonable steps and actions to consummate the transaction set forth in such</span>

---

[2] The authority for Ms. Moritz to appoint a Special Member for purposes of a Company sale is not part of the Terms. In any event, the Board of Managers should appoint a Special Member, if any.

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

written offer and (B) in the event a Company Sale has not been initiated on or prior to the fifth (5th) anniversary of the Effective Date, call a special meeting of the Board of Managers to cause the Company to take all reasonable steps and actions to engage an investment bank experienced in physician practice management transactions to actively market the Company for sale. [3]

(d)     Notwithstanding anything set forth in this Agreement or otherwise to the contrary, during the period commencing on the Effective Date and ending on the fifth (5th) anniversary of the Effective Date, the ~~Member~~ the Board of Managers will be entitled to initiate and consummate any Company Sale transaction that results in Jennings receiving a $10,250,000 payment from Jeffrey M. Gallups, M.D. (not from the Company) so long as Jennings has not previously received the $10,250,000 payment due to her pursuant to the terms of that certain Settlement Agreement, dated October 28, 2016, by and between Jennings and Jeffrey M. Gallups, M.D. ("<u>Gallups</u>"), as amended.

(e)     In the event the Company sells for more than $50,000,000, Mortiz and Jennings shall split the proceeds in excess of $50,000,000 evenly (50%/50%), either in cash, Company ownership options, roll forward equity, or other instruments offered by the purchaser, on terms approved by the Special Master.

(f)     Notwithstanding anything set forth in this Agreement or otherwise to the contrary, in the event the Company pursues a Company Sale, Jennings will cooperate and take all necessary actions to (and will cause the management team and other employees of the Clinical Entities to cooperate and take all necessary actions to) assist in the consummation of such Company Sale, including with respect to the transfer of Jennings' interests in Alpharetta Surgery Center, LLC f/k/a Milton Hall Surgical Center (and its successors and assigns) (the "<u>Clinical Entity</u>") to an individual(s) designated by the independent third party(ies) which is party to the Company Sale (the "<u>Prospective Buyer</u>"), and providing (or causing the management team and other employees of the Clinical Entities to provide) access to the books, records, financial statements, employees/staff, offices/clinics/facilities, and information of the Clinical Entity to the Prospective Buyer.

(g)     For purposes of this Agreement, "<u>Company Sale</u>" means any transaction with an independent third party or group of independent third parties whether by sale or other transfer of equity interests, merger, recapitalization, reorganization, combination, consolidation, or otherwise, pursuant to which one or more such independent third parties will acquire, directly or indirectly, a majority of the equity interests possessing voting power, or a sale of all or substantially all of the assets of the Company, in each case, in a single transaction or series of related transactions to an independent third party. A "Company Sale" shall comply be conducted under the Jurisdiction of the Special Master and the Court, and in compliance with the terms of the Divorce Settlement. Unless otherwise approved by the Special Master, a "Company Sale" shall include provisions for the payment to Jennings at closing of $10,250,000 in cash as non-taxable

---

[3] The Terms do not contemplate any of the actions set out in Section 14 with regard to a "Special Member". The Terms do contemplate that the Company Sale is to be conducted by Board of Managers under the jurisdiction of the Special Master and the Court in a manner which provides $10,250,000 in non-taxable cash paid to Jennings at Closing. This would include the authority to sell the Company for less than $50,000,000 if market conditions and/or a third party appraisal indicate that a price below $50,000,000 is realistic.

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

alimony.  Any taxes associated with the payment of such cash payment to Jennings shall be the responsibility of Gallups.

15.   Certain Continuing Obligations.

(a)   The Member and the Board of Managers shall cause the Company to (i) continue to pay the premiums and interest on the financed life insurance policy relating to Gallups,[4] (ii) continue to pay the premiums and costs of the key man life insurance policies that Milton Hall Surgical Associates, LLC or its affiliates currently pays relating to certain of the physicians employed by Milton Hall Surgical Associates, LLC, (iii) provide and pay for health insurance coverage for Gallups and his family, and (iv) offer or cause Milton Hall Surgical Associates, LLC and/or its successors, assigns, and affiliates to offer and provide clinical services to Gallups and his family, pay for and/or reimburse Gallups for any co-payments and deductibles related to such services, and limit charges for any devices (i.e., hearing aids) or other third party items related to such services at no more than the out-of-pocket costs of the Company, Milton Hall Surgical Associates, LLC, or their respective affiliates.

(b)   The Member and the Board of Managers acknowledge and agree that the Member is employed as the Chief Executive Officer of the Company earning an annual salary of $360,000.  Subject to Section 8(g)(ii), the Member and the Board of Managers shall cause the Company to continue to employ the Member as the Chief Executive Officer of the Company and continue to pay her annual salary of $360,000 ("Base Salary") in a manner that is consistent with the Company's usual payroll practices.  Member shall be entitled to participate in such health, group insurance, and other employee benefit plans, programs, bonus and/or other incentive-based performance plans and arrangements as are made available from time to time to other senior management employees.  In the event Member's employment is terminated for any reason, Company shall continue to pay Member her Base Salary, in accordance with customary payroll practices (the "Severance Payments"), for a period of three years from the date of termination (the "Severance Period").

(c)   Security Interest.

(i)   The Company accepts all of assets of Milton Hall management Inc., and all of the Non-Clinical Assets of Milton Hall Surgical Associates, LLC, ENTI Surgery Center, LLC and Alpharetta Surgery Center, LLC, which Gallups has contributed to the Company subject to the security interest granted in such entities' assets to Jennings pursuant to the Court's order and which are or may be perfected by the filing of UCC-1 Financing Statements associated therewith.

(ii)   The Company hereby grants to Jennings a security interest in and to all of the Company's assets and proceeds thereof pursuant to the terms hereof and in that

---

[4] The Transcript of Proceedings addresses Gallups' personal obligations relating to the retention of insurance for the benefit of Dr. Jennings.  The Parties did not agree for the Company to underwrite these personal obligations. However, the Company's Operating Agreement should not interfere with Dr. Gallup's personal obligations in this regard.

| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |

certain Security Agreement executed by the Company as of the date hereof in favor of Jennings.

(d)      For the avoidance of doubt, the continuing obligations set forth in this Section ~~14~~15 will not be duplicative with any such obligations which are binding on any Affiliate, including similar obligations in the governing documents of any such Affiliate.

(e)      No Member shall transfer any part of their membership interest in the Company without the Board of Manager's prior approval.[5]

16.    <u>Loan to Gallups</u>.  The Company has loaned Gallups a principal amount equal to $650,000[6] on terms and conditions that are consistent with that certain Unsecured Promissory Note, dated as of the date hereof, made by the Member in favor of Gallups in the principal amount of $50,000,000 (as amended), *mutatis mutandis*.

17.    <u>Records</u>.  The Board of Managers shall keep or cause to be kept at the Principal Office the corporate records of the Company.  The Board of Managers shall cause the Company's financial statements to be audited on an annual basis.

18.    <u>Dissolution</u>.  The Company shall be dissolved upon the election of the ~~Member~~ the Board of Managers.  A withdrawal event with respect to the Member shall not dissolve the Company, unless any assignees of the Member's interest do not elect to continue the Company and admit a member within ninety (90) days of such withdrawal event.

19.    <u>Filing Upon Dissolution</u>.  As soon as possible following the dissolution of the Company, the ~~Member~~ the Board of Managers shall execute and file all notices and other documents required under the Act and any other applicable law.

20.    <u>Liquidation</u>.  Upon dissolution of the Company, it shall be wound up and liquidated as rapidly as business circumstances permit, the Member shall act as the liquidating trustee[7], and the assets of the Company shall be liquidated and the proceeds thereof shall be paid (to the extent permitted by applicable law) in the following order: (a) first, to creditors, including the Member if the Member is a creditor, in the order and priority required by applicable law; (b) second, to a reserve for contingent liabilities to be distributed at the time and in the manner as the liquidating trustee determines in its sole discretion; and (c) third, to the Member.

---

[5] Note: The Terms do not address Transfer of a Member's interest.  The form of Operating Agreement circulated by Gallups' counsel also fails to address transfer.  That may be because the LLC is a single-member LLC.  However, because the Special Master and Court retain jurisdiction over the Company for the protection of Jennings, some provision regarding the Member's ability to transfer her interests should be included.  Subsection (e) in sets out this prohibition in orange above.

[6] The Board of Managers (other than, perhaps, Ms. Moritz) are unaware of this loan.  The Parties did not agree for the Company to incur any debt for Dr. Gallups or any other person or entity other than as may be approved by the Board of Managers.

[7] Consistent with the Terms, the Board of Managers have the opportunity to determine the scope of authority to adopt amendments.

**Red**:    Items which directly conflict with the Terms.
**Blue**:   Items that were not part of the Terms and appear without agreement.  Plaintiff
rejects all provisions highlighted in Blue.
**Green**:  Terms that were agreed but do not appear in the Gallups Document.

21.    <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its conflicts of laws principles.

22.    <u>Severability</u>.  If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

23.    <u>Binding Effect</u>.  Except as otherwise provided herein, this Agreement shall inure to benefit of and be binding upon the Member and its respective successors and assigns.

24.    <u>Titles and Captions</u>.   All article, section, and paragraph titles and captions contained in this Agreement are for convenience only and are not a part of the context hereof.

25.    <u>Pronouns and Plurals</u>.   All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the appropriate person may require.

26.    <u>No Third Party Rights</u>.   This Agreement is intended to create enforceable rights between the parties hereto only, and, except as expressly provided herein, creates no rights in, or obligations to, any other persons other than Jennings.

27.    <u>Amendments</u>.    This Agreement may not be amended except by a written document executed by the Member and the Company[8]; provided, that any amendment or modification to <u>Section 13</u> will require the consent of Jennings, which consent will not be unreasonably withheld, conditioned, or delayed.

*[Signature Page to Follow]*

---

[8] Consistent with the Terms, the Board of Managers shall have the opportunity to determine the identity of the Liquidating Trustee.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date and year first above written.

**MEMBER:**

_____
Melissa E. Moritz

**COMPANY:**

Marble Management, LLC,
*a Georgia limited liability company*

By:_____
Name:_____
Title:_____

Agreed and Acknowledged on and as of
the Effective Date:

_____
Nancy Jennings, M.D.

_____
Jeffrey Gallups, M.D.

Schedule A

As of July [●], 2023

| Member | Limited Liability Company Interest |
|---|---|
| Melissa E. Moritz<br>[Address 1: _____]<br>[Address 2: _____] | 100% |

## RESERVED ITEMS and DISPUTED ITEMS

1.      **Fees**.  [RESERVED ITEM]  The parties reserved the timing and method of the payment of the Fees due to counsel and the professionals engaged by the Parties, including the Special Master.

2.      **K-1's and Past Due Taxes**.  [RESERVED ITEM]  As the entity providing financial management services for Alpharetta Surgical Center, LLC ("***Alpharetta ASC***"), the Company shall cause Alpharetta Center to issue K-1's to Jennings consistent with her minority interest in Alpharetta ASC and for Alpharetta ASC to pay applicable taxes due from Dr. Jennings as a consequence of failure to provide such K-1's.

3.      **Gallups' Life Insurance Policies.**..[RESERVED ITEM]  Whether the both of Dr. Gallups' life insurance policies issued in favor of Dr. Jennings terminate upon Dr. Jennings' receipt of the $10,250,000, or whether Dr .Jennings continues to be the beneficiary of policies upon Dr. Gallups' death.

4.      **Right to Modify the Note Downward.**  [DISPUTED ITEM]   Whether the Special Master has the right to modify the principal amount of the Promissory Note downward to encourage a sale less than $50,000,000.  However, it is undisputed that the Company has the right to effect a Company sale for less than $50,000,000.

5.      **All of the Terms in the Term Sheet Relating to the Operating Agreement**. [OPEN ITEMS NOT BINDING ON MELISSA MORITZ]  The Court agreed that Gallups could not speak for Melissa Moritz at the Hearing, and that Melissa would not be bound to the Term Sheet if she objected to any particular term.  Presumably the Court would need to issue an Order specifically obtaining jurisdiction over Marble Management to force Melissa to comply fully with the Term Sheet rather than in a *pro forma* way.

APPENDIX "9"

*Execution Version*

---

**Note**:  The Parties to Civil Action 2020cv337822 styled *Jennings v. Gallups* attended a Hearing before Fulton County Superior Court Judge Craig Schwall on July 20, 2024 (the "***Hearing***").  There the Parties agreed under oath to the terms and conditions of a purchase and sale transaction which were described to the Court and memorialized in the Transcript of Proceedings.

On July 29, 2023, counsel for Defendant Gallups circulated transaction documents (the "***Gallups Documents***") which purport to reflect the terms agreed to the parties (but not necessarily Melissa Moritz) at the Hearing (the "***Terms***").  Below is a copy of the Unsecured Promissory Note of Melissa Moritz as circulated as part of the Gallups Documents.  The markings appearing below highlight the discrepancies between the Terms and the Note presented by Gallups' counsel.

---

<u>Color Key</u>

**Red**: Items which directly conflict with the Terms.

**Blue**: Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue.

**Green**: Terms that were agreed but do not appear in the Gallups Documents.

**Orange**: Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note.

---

THE SECURITY REPRESENTED HEREBY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SUCH STATE SECURITIES LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

UNSECURED
PROMISSORY NOTE

$50,000,000.00                                                            Atlanta, Georgia
[_____], 2023

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Melissa E. Moritz [_____] (hereinafter referred to as "<u>Maker</u>"), hereby unconditionally promises to pay to Jeffrey M. Gallups, M.D., (and together with his successors and assigns, hereinafter referred to as "<u>Holder</u>"), in the manner hereinafter provided, the aggregate principal sum of Fifty Million Dollars ($50,000,000.00), in immediately available funds and in lawful money of the United States of America, together with interest thereon, all in accordance with the provisions hereinafter specified.

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

1.      <u>Accrual of Interest</u>. Interest shall accrue and be computed on the principal amount outstanding from time to time under this Note until the same is repaid in full at a rate equal to five percent (5%) per annum. Interest shall be calculated hereunder on the basis of a 365-day year for the actual number of days elapsed.

2.      <u>Payment of Interest</u>. Maker shall pay interest on this Note commencing on [_____] 2023, and monthly thereafter in arrears on the last business day of each such period and on the Maturity Date (as hereafter defined), to Holder. During the continuance of an Event of Default, notwithstanding anything else to the contrary contained in this Note, interest payable on the outstanding principal hereunder shall bear interest at the then applicable interest rate set forth in the immediately preceding section plus five percent (5%) per annum and such interest shall be payable upon demand.

3.      <u>Maturity Date</u>. The entire unpaid principal amount of this Note, together with all accrued unpaid interest, shall be due and payable upon the occurrence of the consummation of a sale or other change of control transaction (whether by merger, stock or equity sale, sale of all or substantially all of the assets, business combination, or other change such that following such transaction or series of transactions the identity, composition, and/or decision making authority relating to the applicable board of managers or similar governing body resides is someone(s) different than prior to the transaction or series of transactions) involving Marble Management, LLC, a Georgia limited liability company ("<u>Marble Management</u>")(the "<u>Maturity Date</u>") or, if earlier, the date on which this Note is declared due and payable pursuant to the terms of this Note, including without limitation as provided in <u>Section 9</u> of this Note.

4.      <u>Voluntary Prepayments</u>.

        (i)      The principal amount outstanding from time to time under this Note may be prepaid in whole or in part at any time and from time to time without premium or penalty. Any prepayment of principal shall be accompanied by payment of any interest accrued and unpaid through the date of such prepayment.

        (ii)      No prepayment of principal of this Note shall extend or postpone the due date of any subsequent payment of principal and interest due hereunder.

5.      <u>Manner and Application of Payments</u>. All amounts payable in cash hereunder shall be payable to Holder by wire transfer of immediately available funds and in lawful money of the United States of America, deduction or counterclaim at such place as Holder may from time to time designate in writing to Maker. Payments hereunder shall be applied first to interest and then to principal outstanding hereunder. If any payment of principal or interest under this Note shall be payable on a day other than a business day such payment shall be made on the next succeeding business day and interest shall be payable at the rate specified in this Note during such extension.

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

6.     <u>No Security</u>. This Note is an unsecured obligation of Maker and no collateral accompanies the obligations hereunder.

7.     <u>Covenants</u>.

(i)     <u>Further Assurances</u>. Maker shall execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, any and all such further assurances and other agreements or instruments, and take or cause to be taken all such other action, as shall be reasonably necessary from time to time to give full effect to this Note and the obligations hereunder.

(ii)     <u>Notices of Defaults</u>. As soon as possible and in any event within two (2) business days after Maker becomes aware of a default or event of default under any indebtedness of Maker, including but not limited to a Default or Event of Default under this Note, Maker shall notify Holder in writing of the nature and extent of such default or event of default and the action, if any, Maker has taken or proposes to take with respect to such default or event of default.

8.     <u>Events of Default</u>. Each of the following acts, events or circumstances shall constitute an Event of Default (each an "<u>Event of Default</u>") hereunder:

(i)     Maker shall default in the payment when due (in accordance with the terms of this Note) of any principal;

(ii)     Maker shall default in the payment when due (in accordance with the terms of this Note) of any interest owing hereunder;

(iii)     (a) Maker shall commence a voluntary case concerning itself under any bankruptcy, insolvency or similar laws or statutes (including Title 7 of the United States Code, as amended, supplemented or replaced) (collectively, the "<u>Bankruptcy Code</u>"); or (b) an involuntary case is commenced against Maker and is not dismissed within ninety (90) days; or (c) a "custodian" (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of Maker or Maker commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Maker or there is commenced against Maker any such proceeding; or (d) any order of relief or other order approving any such case or proceeding is entered; or (e) Maker is adjudicated insolvent or bankrupt; or (f) Maker shall by any act or failure to act consent to, approve of or acquiesce in any of the foregoing;

(iv)     Maker shall fail to perform or observe any agreement, covenant or obligation arising under any provision hereof; or

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

(v)    any material adverse effect shall occur with respect to (a) the validity or enforceability of this Note or the rights, powers and privileges purported to be created hereby, or (b) the right rights and remedies of the Holder hereunder.

If an Event of Default, other than an Event of Default described in Clause (iii) of this section, occurs, Holder by written notice to Maker may declare the principal of and accrued interest on this Note to be immediately due and payable. Upon a declaration of acceleration, such principal and interest shall become immediately due and payable. If an Event of Default described in Clause (iii) of this Section occurs, the principal of and accrued interest on this Note then outstanding shall become immediately due and payable without any declaration or other act on the part of Holder.

9.    <u>Special Provisions Regarding Court Jurisdiction</u>.  The Parties acknowledge that the Superior Court of Fulton County, Georgia maintains jurisdiction over this Note and the transactions associated with this Note pursuant to Civil Action NO. 2020CV337822 (the "<u>Court</u>"). Pursuant to an order of the Court, Frank Strickland has been appointed Special Master (the "<u>Special Master</u>") with authority over this Note and transactions related thereto until Jennings receives the Guaranteed Payment as defined in Marble Management's Amended and Restated Operating Agreement ("<u>Marble Operating Agreement</u>.")

10.    <u>Guaranty</u>. The effectiveness of this Promissory Note and the transactions contemplated by that certain Membership Interest Purchase Agreement by and between Melissa E. Moritz, Marble Management, LLC, and Jeffrey M. Gallups, M.D., dated as of the date hereof, are expressly conditioned on the guaranty by Marble Management, LLC (the "<u>Guarantor</u>") of the terms, covenants, and conditions of this Promissory Note.  The Guarantor hereby irrevocably and unconditionally guarantees to Gallups the absolute, complete, and punctual performance of this Promissory Note by Guarantor.  The obligation of the Guarantor hereunder is an absolute, primary, irrevocable, unconditional, continuing guarantee of payment and performance by the Guarantor (and not a guarantee of collection) and will not terminate until the Guarantor has paid in full all amounts owing to Gallups under this Promissory Note.

Upon any Event of Default, Maker shall no longer be obligated under this Promissory Note and Guarantor shall assume all obligations under this Promissory Note.

As used herein, the term "<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

11.    <u>Attorneys' Fees</u>. Maker agrees to pay all costs and expenses of collection and enforcement of this Note when incurred, including Holder's reasonable attorneys' fees and legal and court costs, including any incurred on appeal or in connection with bankruptcy or insolvency, whether or not any lawsuit or proceeding is ever filed with respect hereto.

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

12.     <u>Notices</u>. Any notices required or permitted to be given under the terms of this Note shall be sent or delivered personally or by courier (including a recognized, receipted overnight delivery service) or by facsimile (with a copy sent by a recognized, receipted overnight delivery service) and shall be effective upon receipt, if delivered personally or by courier (including a recognized overnight delivery service) or by facsimile, in each case addressed to Maker or Holder. The addresses for such communications shall be:

If to Maker:

> Melissa E. Moritz
> 3460 Preston Ridge Rd. Ste. 150
> Alpharetta, GA 30005

If to Holder:

> Dr. Jeffrey Gallups
> 205 Hendricks Isle
> Fort Lauderdale, FL 33301

Maker or Holder shall provide notice to the other of any change in its address.

13.     <u>Usury</u>. All terms, conditions and agreements herein are expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to Holder for the use, forbearance or detention of the money advanced hereunder exceed the highest lawful rate permissible under applicable laws. If, from any circumstances whatsoever, fulfillment of any provision hereof shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction, in a final determination may deem applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if under any circumstances Holder shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to reduction of the unpaid principal balance due hereunder and not to the payment of interest.

14.     <u>Severability; Invalidity</u>. Maker and Holder intend and believe that each provision in this Note comports with all applicable local, state and federal laws and judicial decisions. However, if any provisions, provision, or portion of any provision in this Note is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, or administrative or judicial decision, or public policy, including applicable usury laws, and if such court would declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force and effect to the fullest possible extent they are legal, valid and enforceable, and the remainder of this Note shall be construed as if such illegal,

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement. Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

invalid, unlawful, void or unenforceable portion, provision or provisions were severable and not contained herein, and the rights, obligations and interest of Maker and Holder under the remainder of this Note shall continue in full force and effect.

15.     <u>No Strict Construction</u>. The language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

16.     <u>Assignment</u>. Maker may not transfer, assign or delegate any of its rights or obligations hereunder without the prior written consent of Holder. Upon the Special Master's prior written consent, Holder shall have the right, without the consent of Maker, to transfer or assign, in whole or in part, its rights and interests in and to this Note, and, as used herein, the term "Holder" shall mean and include such successors and assigns. This Note shall accrue to the benefit of Holder and its successors and assigns and shall be binding upon the undersigned and its successors and assigns.

17.     <u>Amendment</u>. The provisions of this Note may be amended only by a written instrument signed by Maker and Holder, with the prior approval of the Special Master.

18.     <u>Governing Law</u>. THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF ALL PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF GEORGIA.

19.     <u>Jurisdiction; Waiver of Jury Trial</u>. ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS NOTE SHALL BE FILED, TRIED AND LITIGATED IN ~~THE STATE AND FEDERAL COURTS LOCATED IN ATLANTA, GEORGIA. MAKER WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE, INCLUDING CONTRACT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. MAKER HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES THE AFORESAID TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS NOTE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY~~ THE COURT.

*[Remainder Of Page Intentionally Left Blank; Signature Page Follows]*

{02624912-1 }
DM_US 197198129-5.108320.0011

| | |
|---|---|
| **Red**: | Items which directly conflict with the Terms. |
| **Blue**: | Items that were not part of the Terms and appear without agreement.  Plaintiff rejects all provisions highlighted in Blue. |
| **Green**: | Terms that were agreed but do not appear in the Gallups Document. |
| **Orange**: | Items that were not part of the Terms and not addressed by the Gallups Documents, but which the Special Master believes should be part of the Note. |

EXECUTED AND DELIVERED as of the first date written above.

**MAKER:**                                    **MELISSA E. MORITZ**

 

_____

Melissa E. Moritz

 

**GUARANTOR:**                              **MARBLE MANAGEMENT, LLC**

 

_____

Melissa E. Moritz, CEO

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date indicated below, I transmitted a copy of the foregoing *Special Master's Report and Recommendation Respecting Status of Incremental Transfer of the Companies* to the Court, Petitioner's counsel, and Respondent's counsel *via* email, as follows:

> Honorable Craig L. Schwall, Sr.
> Judge, Superior Court of Fulton County
> c/o Rupal Romero
> Rupal.Romero@fultoncountyga.gov
>
> Peter V. Hasbrouck, Esq.
> Martenson, Hasbrouck & Simon LLP
> pvhasbrouck@martensonlaw.com
>
> Elizabeth Green Lindsey, Esq.
> Davis, Matthews & Quigley, P.C.
> elindsey@dmqlaw.com

August 8, 2023.

> /s/John K. Rezac
> John K. Rezac
> Georgia Bar No. 601935
> Taylor English Duma LLP
> 1600 Parkwood Circle
> Suite 200
> Atlanta, GA  30339
> Tel. 678-336-71953
> Fax. 770-434-7376
> jrezac@taylorenglish.com

{02624777-4 }